THE VULCAN DETINNING COMPANY

*v.*

AMERICAN CAN COMPANY et al.

[Decided January 13th, 1906.]

1. Where a company is using a trade secret, the employment of a person having knowledge that the company is trying to keep secret its methods, is sufficient to raise an implied contract between them that the employe will not divulge it.

2. A corporation is charged with knowledge of its agent, employed to purchase a secret process for detinning, that the company from which the purchase is made obtained the secret by fraudulent methods from the true owner, and is not entitled to restrain its use by another company which obtained the secret from it by fraudulent means.

3. Where some of the officers of a company resign and fraudulently use for their own benefit a secret process for detinning in use by the company, which it had purchased from one known to have procured it fraudulently from the original owner, the persons who resigned from the

company having subsequently obtained a license from the original owner to use the process, do not hold such license in trust for their former associates, for the unconscientious conduct of the latter gives them no standing in equity.

————

*Messrs. McCarter, Williamson & McCarter* and *Mr. Henry Wollman,* for the complainant.

*Messrs. Lindabury, Depue & Faulks,* for the defendants.

BERGEN, V. C.

The evidence in this cause shows that the firm of "Th. Goldschmidt," of Essen, Germany, had, prior to 1894, as the result of experiments pursued for that purpose, so perfected a process by which well-known chemical and mechanical principles could be so applied in the separation and recovery of different metals as to render the detinning of tin scrap profitable to a degree not theretofore attained.

The successful combination was not patented, but its inventors sought to protect themselves against infringement by keeping their discovery a secret, only imparting it to such of their employes as the carrying on of the business required, and then only upon a promise not to divulge.

Dr. Hans Goldschmidt, the member of the firm most active in making the experiments and obtaining the results, testified in detail regarding the agents used, viz., electricity, steam, lime and caustic soda, and the required relative power and quantity of each, and also described with great particularity the size, character and relative positions of the machinery and other necessary mechanical instruments used in their detinning plant.

In order to understand precisely what these inventors claimed was the secret process which they had discovered, we cannot do better than reproduce a portion of the cross-examination on this point, which is as follows:

"*Q.* You say that you invented this process that you have described?
"*A.* Yes, sir, I did.
"*Q.* Wasn't electrolysis well known before the time you claim you invented this process?

"*A.* If you mean by electrolysis electrolytical processes, I answer that there were known a good many electrolytical processes for recovering metals of different kinds.

"*Q.* You mean by that the separation of metals by electric current?

"*A.* The principles were known and some of them applied in practice.

"*A.* And this was true of tin, was it not?

"*A.* No.

"*Q.* So that your answer is that tin had never been removed from iron by electricity?

"*A.* That is not my answer; it has been removed before, but on a smaller scale.

"*Q.* Regeneration of lye was known before the time last spoken of, was it not?

"*A.* What kind of regeneration of lye do you mean?

"*Q.* Application of carbonic acid and caustification by lime?

"*A.* The principle was known.

"*Q.* What, then, was novel in your process of invention?

"*A.* There were a good many things new, which I partly described this morning; the main things are the size of the baskets, the size of the tubs, and the distances, especially worked out, of the baskets from the walls of the tubs; then the especial kind of inflow pipes, as described, and the overflow; the electric combination of the tubs, as described; last, not least, the whole arrangement of the plant, which was set up in a manner that the handling of the bulky material was saved as much as possible; also, the making of the bundles by the steam hammer was new; all those details, of course, were never published, but were kept secret."

It also appears, by a great preponderance of evidence, that while, prior to the discovery by Goldschmidt, a number of persons were engaged in detinning scrap, and in so doing used the same agents employed by Dr. Goldschmidt, the business was not especially profitable; but when the processes which Dr. Goldschmidt claims to have discovered were applied to the detinning of scrap a very profitable result followed, leading to the building up of a successful business under their management at Essen. The growth of the business at Essen required the purchase of large quantities of tin scrap, some of which was bought in England and some in New York, the purchases in the latter city being made largely, if not entirely, from A. Kern & Company, a firm engaged in importing and exporting goods. The scrap from England appears to have been shipped, prior to 1895, through the Zealand Steamship Company, in the employment of which company were M. Lacrnoes, R. J. Brakema and H. L. Herman,

who through their connection with the Zealand company, it is fair to presume, acquired some knowledge of the character and extent of the Essen business, for about this time they built a detinning plant at Vlissingen, Holland, under the name of the "Electro-Tinfabriek," and through newspaper advertisements, followed by personal interviews, induced two of the confidential employes of the Essen factory, namely, William Zeyen, who had been employed by Goldschmidt from August, 1891, as foreman of the electrolysis room, and had become familiar with the Essen process of detinning, and William Foerster, who had been employed in the same factory from 1892, and worked in the cooking-room, the place where the brine was prepared and regenerated, to leave their employment in Essen and enter the service of the Holland company. Both of these employes had agreed with the Goldschmidt firm that they would refrain from communicating the processes in use which were claimed to be secrets. I have no hesitation in finding that the processes used by Laernoes and his confederates in the Holland factory were, for all practical purposes, the same as those used by the Goldschmidts in their Essen factory, and that it was the intention, deliberately formed, and boldly carried out by Laernoes and his partners, to obtain, by stealth and fraud, the secret processes and methods in use in the Goldschmidt factory, and that this theft was accomplished by debauching and corrupting the trusted servants of the Goldschmidts. It can serve no useful purpose to here recite the evidence which justifies this conclusion. It is sufficient to say that there is no denial of the facts offered in display of the iniquity of Laernoes and his partners. Considerable evidence has been taken in this cause in Germany under a commission issued for that purpose, but Mr. Laernoes was not called as a witness to explain the many damaging circumstances proven. Mr. William Zeyen is in New Jersey, in the employ of the complainants in this cause, and the neglect to produce him, unexplained, justifies the conclusion that he could not deny his wrong-doing. Mr. Foerster was called and exposed the disreputable methods employed by Laernoes to obtain the secret.

The possibility of erecting a detinning plant in this country attracted the attention of Mr. Adolph Kern, the senior member of the firm of A. Kern & Company, as early as 1892, at which time he opened negotiations with the Messrs. Goldschmidt looking to the establishment of such a plant in America, to be operated according to the processes in use in Essen. The negotiations, carried on principally by correspondence until 1897, produced no satisfactory result, and in December of that year a party of gentlemen, seven in number, of whom the defendant Assmann was one, met with Mr. Kern at an office in New York City to consider the desirability of making further efforts towards the founding of a detinning factory in the United States. At that time subscriptions to the amount of $42,000 towards the organization of a company for that purpose had been secured, and the gentlemen taking part in the conference determined that sufficient progress had been made to warrant the sending of Mr. Kern to Europe for the purpose of obtaining one of the secret processes in use there. In furtherance of this conclusion, Mr. Kern first visited the Holland factory, and then went to Essen, where he saw the Messrs. Goldschmidt, and tried to induce them to join the enterprise, but they refused, giving as a reason that, in their opinion, the cost of wages and materials in the United States would prevent the successful application of the process in that country. From Essen Mr. Kern returned to Holland and entered into negotiations with Laernoes, who acted for the Electro-Tinfabriek, of Vlissingen, which resulted in an optional contract, by the terms of which, in consideration of one-third of the capital stock of a company to be organized for the carrying on of the detinning business in the United States, the Holland company were to furnish the processes according to which they were detinning scrap, together with all necessary plans and instructions to properly install a plant, and also to send over to this country two men qualified to give instructions and to superintend the erection of the factory. On his return to this country Mr. Kern submitted to his associates the result of the negotiations he had made in their behalf, and he was directed to accept the option and to procure a formal

contract based on its terms. This was done, and Laernoes with Zeyen came to this country to . supervise the erection of the factory and instruct the purchasers how to operate it. On the arrival of Laernoes the formal contract was prepared and executed between the Electro-Tinfabriek and A. Kern & Company, Laernoes acting and signing as the representative of the Holland firm. Thereupon a company was formed under the name of the "Vulcan Metal Refining Company," to which company A. Kern & Company assigned the contract which they had made on behalf of their associates with the Holland company. The method of construction and operation as carried on in Holland was thereupon committed to writing by Laernoes and delivered to the company, and upon the suggestion of Mr. Assmann, four copies were made of the original formula, one being handed to each of four trustees appointed by the board of directors, to hold in trust for the company, the reason given by Mr. Assmann being, as stated by Mr. Kern, "that as we have a valuable secret process, it ought to be preserved so as to guard against the loss of it by the death of any one of the parties conversant with it." The original and all of the copies, except the one held by Mr. Assmann, as trustee, have been destroyed. The reason for the destruction was not made to appear, and when Mr. Assmann dissolved his connection with the company, the copy which he had was delivered to Mr. Kern. A factory was erected during the year 1898 at Sewaren, New Jersey, and in 1899 another company was organized by the same parties, under the title of the "Vulcan Western Company," and this company, supplied with the same formula, erected a similar plant at Streator, Illinois. Subsequent to this the two companies were merged into the complainant company. In 1901 Mr. Assmann, having then become a director and officer of the American Can Company, resigned his position with the Vulcan company, and sold his stock to Mr. Kern, giving as a reason for dissolving his connection with the Vulcan company that as the American Can Company was a large seller of tin scrap to the Vulcan company, of the selling of which he had charge, he could not consistently continue to occupy the position of buyer and seller. Shortly after Mr.

38

Assmann dissolved his relations with the Vulcan company, the American Can Company began the erection of two detinning plants, one at Paulsboro, New Jersey, and the other at Joliet, Illinois, and employed the defendants Schmaal, Baumann and Egbert, Schmaal having until very recently been, and Baumann and Egbert then being, employed by the complainant company in positions of trust, such as necessarily required the imparting to them of the alleged secret processes used by the complainant company. Considerable testimony was directed to supporting and denying the allegation that these defendants were employed under an express contract not to reveal the secret processes in use. I am, however, satisfied, even in the absence of an express agreement, that the confidential relation existing between these defendants and the complainant company, and the effort made by it, to the knowledge of these defendants, to keep secret the methods employed, is sufficient to raise an implied agreement on their part not to divulge any such secret.

No reasonable doubt can exist under the evidence in this cause that the methods and processes in use by the defendants, the complainant Lacrnoes and his partners, under the name of the Electro-Tinfabriek, and by the Messrs. Goldschmidt at Essen, are, for all practical purposes, identical, the changes in mechanical construction being so small and unimportant as to hardly merit consideration. The bill of complaint prays that the American Can Company, and the defendants Assmann, Baumann, Schmaal and Egbert, may be enjoined from operating the detinning plants at Paulsboro and Joliet, or constructing or operating any other factories in imitation of those of the complainants, or for the purpose of utilizing or operating under said secret process, or any improvements thereon, and that the three defendants last named be enjoined from performing any further services in the detinning plants of the can company, and that the employes of Assmann and the can company be enjoined from using or communicating any knowledge they may have of the secret process, or of the construction or operation of complainant's plant, and that they be required to surrender and destroy all copies of such secret process and of all drawings and

designs that might aid any other in the construction of similar plants.

The defendants, among other things, seek to justify their action upon the ground that the process was not a secret one. It certainly appears that a number of persons, particularly in Germany, were engaged in detinning by a process in some particulars not unlike that in use at Essen by the Messrs. Goldschmidt, yet it is equally clear that until the Goldschmidts had perfected their plant the detinning business cannot be said to have been successful, and I am inclined to the belief that the Goldschmidts did discover a method or process for detinning scrap, which was not known to their competitors, and that so far as they are concerned their secret could not be said to have been divulged by them, and if it escaped it was through the gross betrayal of a confidence reposed in a trusted employe. While it thus appears that when Mr. Kern was dealing, on behalf of his associates, with Laernoes and his partners for a sale of the information which they possessed, and which they had surreptitiously obtained from the Essen factory, the methods and processes then employed were not so well known as to have become the property of the world, it is manifest from this evidence that from the year 1900 down to and including the year 1902, numerous publications appeared in scientific journals describing with some particularity these or similar processes. A notable article on this subject, by Dr. Hans Mennicke, was published in May and June in the "Zeitschrift fur Electrochemie." A reading of this article, in comparison with the formula furnished by Laernoes, justifies the testimony of Mr. Leitch that it describes the process employed at Paulsboro and Joliet. So if this case was devoid of what the complainant insists is a trust relation between the parties, I should have no hesitation in declaring that the process is no longer such a secret as to justify the interference of this court in preserving it to the complainant. What the complainant insists upon is that Mr. Assmann, as one of the original associates, occupies a relation of trust and confidence towards those who, in conjunction with him, purchased this secret, and who, relying upon his agreement to preserve the secret, became stockholders of the com-

plainant company, and invested their money, and he ought now to be estopped from declaring that the process is no longer a secret, without regard to whether or not Laernoes and his partners had a title which they could properly convey. This contention, they claim, is supported by the following expression to be found in the opinion of Vice-Chancellor Reed overruling a demurrer interposed to the bill of complaint in this cause: "Now, the title to this trade secret, held by the Vulcan company, was, I think, good against every one but Dr. Goldschmidt and his assignee. A person who became bound to the Vulcan company, by contract or by confidence, cannot, as against that company, when suing for a breach of such contract or confidence, set up that the Vulcan company had no right to such trade secret, because it had been obtained honestly from owners who had dishonestly obtained the knowledge from the discoverer." *Vulcan Detinning Co.* v. *American Can Co., 67 N. J. Eq. 243.*

While the proposition thus stated by Vice-Chancellor Reed appeals with great force to a court of equity, and is one which I would be bound to follow if the conditions which he states were present, viz., that "it had been obtained honestly," it has no application here, because, in my judgment, the secret was not honestly obtained by Mr. Kern for his associates, because he had sufficient knowledge of the dishonest manner in which the Holland people obtained the secret from the rightful owner to charge him with notice of all such facts as a proper inquiry would have disclosed, and that knowledge will be imputed to his associates and the officers of the company for whom he was acting, in the business to which it related.

A corporation is liable for the fraud of its agents acting within their authority and in due course of its business, and cannot shield itself from responsibility by showing that the agent also failed in his duty to the corporation. *First National Bank of Hightstown* v. *Christopher, 40 N. J. Law (11 Vr.) 435, 439.* "The fact that the information had not been acquired by him in the course of his agency does not militate against the application of the rule in question, when the agent personally participates in the later transaction in behalf of the corporation. Where information is casually obtained by an agent for a corporation the cor-

poration is not charged with notice from the mere fact of its agent's knowledge; but if the corporation act through such agent in a matter where the information possessed by him is pertinent, the knowledge of the agent will be imputed to the principal. To bring about this result two things must concur, viz., the possession by the agent of pertinent information and his personal participation in respect thereto on behalf of his corporation." *Willard* v. *Denise, 50 N. J. Eq. (5 Dick.) 482.*

Mr. Kern admitted that before he had any dealings with Laernoes, and on the 16th day of May, 1896, he learned from Dr. Goldschmidt, by correspondence, that Laernoes, representing the Holland concern, had obtained his secret processes through Mr. Zeyen, one of his servants, and that Zeyen had been arrested and punished in a German court for taking from the Essen factory, for the purpose of conveying it to Laernoes, a sample part of a metal basket used in the Essen factory, and that one of these letters from Goldschmidt, if not two, contained copies, taken from German newspapers, of articles describing the alleged offence. A part of the article which Mr. Kern had reads as follows:

"During the duration of the shipping contract by which the Zealand company acted as agents for Th. Goldschmidt, the officers of this company advertised anonymously in the Essen papers for workmen on goods such as the Goldschmidt concern was making. After several workmen had applied, and had been engaged, although they remained for the time being in the employ of the Essen firm, Inspector Laernoes obtained from them an exact description of the process and drawings of the apparatus. Workman Zeyen, who is now accused, refused to furnish samples, as only a short time before another workman had been punished for a similar theft. After the necessary apparatus had been constructed in accordance with drawings obtained from the man Zeyen, employed by Laernoes, Zeyen took leave of absence, under false pretences, went to Vlissingen, and made the first experiments on a steamer belonging to the Zealand company. The workman thereupon returned to Essen, and remained after his engagement, by order of the company, as it were, as a spy, with the firm in Essen. Later the Essen firm got wind of the competition, but without knowing that the Zealand company was back of it. The firm of Goldschmidt therefore turned to the Zealand company, whom they considered as their friends, and asked for information regarding the new firm, whereupon they were told that the Zealand company knew nothing of such a firm in that place. At the same time, the workmen engaged by Laernoes and his associates were speedily called

away from Essen to Vlissingen. Later it was learned that the workmen had not only furnished information and plans, but also samples, which were of the greatest importance in the carrying on of the work."

When Mr. Kern went to Holland for the purpose of obtaining the secret process he had with him the letters and newspaper extracts which he had received from Dr. Goldschmidt, and the only steps which he took to verify or disprove these charges was to communicate them to Laernoes, who very naturally denied them. The following extracts from the cross-examination of Mr. Kern on this point are very suggestive:

"*Q.* Did you make any inquiry as to whether or not the plant at Flushing differed in the smallest detail from the Essen plant?

"*A.* I did not.

"*Q.* Did you inquire as to whether or not the process used at Flushing differed in the smallest detail from the process used in the Essen plant?

"*A.* Mr. Laernoes told me that it was a different process.

"*Q.* Did you ask him how it differed?

"*A.* We did not go into details, because he refused to speak of it; he refused to go into details in regard to it.

"*Q.* Did you ask him how it was that he had enticed this man away from Dr. Goldschmidt—why he did that?

"*A.* I did not.

"*Q.* Did you ask him how it was that he had the man that he had employed from Essen bring samples from the works there?

"*A.* I did not.

"*Q.* Did you ask him whether they did or not?

"*A.* I did not; but he told me that they did not.

"*Q.* Did he tell you they did not?

"*A.* Yes, he told me that of his own accord; he gave me that information himself.

"*Q.* Did he explain, then, how it was that both of them were convicted of doing it—what did he say to you about that?

"*A.* He said that he was not convicted.

"*Q.* He said that personally to you; now, the paper told you that both of the men he employed were convicted and sent to prison?

"*A.* He explained it on the score of prejudice on the part of the court of Essen.

"*Q.* Did he deny that the men had brought samples from the Essen plant to him?

"*A.* He did.

"*Q.* Did you ask him about his keeping the man at the Essen plant as a spy, after he had employed them to put up the Flushing plant?

"*A.* I did not.

"*Q.* Did he say anything to you about that?

"*A.* He did not.

"*Q.* You knew that the paper—the steel and iron paper—had charged that?

"*A.* Yes, sir.

"*Q.* Did you ask him about his having advertised in Germany for men understanding this process?

"*A.* I did not.

"*Q.* Did you ask him whether or not, in fact, he obtained from these two men that he had employed from Essen a thorough and detailed description of the process and a drawing of the apparatus?

"*A.* I did not.

"*Q.* Did he make any statement on that subject to you?

"*A.* I do not think he did; he simply denied having stolen anything, and stated that the man whom he engaged knew very little about the process.

"*Q.* Did he state whether or not he availed himself of what that man did know about the process?

"*A.* He did not."

A careful reading of Mr. Kern's testimony discloses that he not only made no effort to obtain the whole truth from Laernoes, but admits that he made no attempt to find out from Dr. Goldschmidt, whom he afterwards saw, whether there was any truth in what Laernoes did deny, or whether the story published was true or false. It is perfectly clear to me that, being unable to negotiate with Dr. Goldschmidt, he decided to obtain the information he was so anxious to get from Mr. Laernoes, although, if not already convinced that he was purchasing from Laernoes stolen property, he very carefully abstained from so using the information which he had as to ascertain the truth.

When stripped of all refinements, the situation presented is this: Dr. Goldschmidt discovers a secret process for detinning; Laernoes entices Zeyen, a trusted employe, to betray his master, whereby he became possessed of a secret process belonging to another; that secret the complainant purchases, under conditions which charge it with knowledge of the wrong committed against Dr. Goldschmidt, thereby helping Laernoes and Zeyen to market their stolen property. It is not to be conceived that a court of equity will stain its hands by contact with such a disreputable proceeding.

It was most strenuously insisted on the argument by the complainant that its association with Laernoes in procuring this secret was a matter entirely distinct from the present contro-

versy, and that the rule requiring a complainant to come into a court of equity with clean hands does not require that all his acts be pure, and that the uncleanliness for which the rule may be invoked must have some relation to the other party. My conclusion is that the rule applies in this case. The foundation of the complainant's right rests upon the assignment to it by Laernoes of the right to use this secret, and if in ascertaining its title, for without title it would have no property to protect, it is made to appear that the title was acquired knowingly from one who could never equitably invoke the court's protection, good conscience requires that the court should abstain from interfering. It is not alone fraud or illegality which will prevent a suitor from entering a court of equity. Any really unconscientious conduct connected with the controversy to which he is a party will repel him from the forum whose very foundation is good conscience. *Pom. Eq. Jur.* § 404.

In *Edward Thompson Co.* v. *American Law Book Co.*, *122 Fed. Rep. 922,* relief by way of injunction was refused upon the ground that the acts of the defendant of which the complainant complained were of the same character as those in which the complainant was itself indulging, and that if the defendant was guilty of literary piracy, the complainant was guilty of the same offence, and that a literary pirate was not entitled to consideration in a court of equity, Judge Coxe saying, "consistency requires that the defendant should not be punished for doing that which the complainant does with perfect impunity."

In *Krauss* v. *Peebles' Sons Co.*, *58 Fed. Rep. 585,* Judge Taft stated the rule as follows: "The reason why relief is refused complainant in such cases has nothing to do with the defendant's rights or wrongs. It is that the court will not protect a fraudulent business of a plaintiff, however much in the wrong the defendant may be."

In cases of this class the jurisdiction of the court is rested upon its duty to protect property from wanton destruction, and it interferes by injunction because that is the only efficient method by which property of this character can be preserved to the owner. This complainant claims to be the true owner of a

secret process, a recognized species of property, but when the owner asks the aid of the court to restrain the defendant from injuring his property, it is essential that he should not be guilty of any wrong-doing in connection with the property he seeks to protect. He cannot represent to the court that he came honestly by the property when the contrary is the truth, and then successfully invoke the help of a court of equity, for he is guilty of a false representation regarding the very right which he desires protected. The complainant in this cause pirated a secret process belonging to the Goldschmidts. The defendants are, if we accept the complainant's contention, guilty of the same offence, one step removed, and as each is using the same secret process, the property of another, from whom, to the knowledge of each, it was dishonestly obtained, they are both in *pari delicto. Leather Cloth Co.* v. *American Leather Cloth Co., 4 De G. J. & S. 137; Manhattan Medicine Co.* v. *Wood, 108 U. S. 218.*

The proposition advanced by the complainant, viz., that the defendants having agreed with the complainant, either as joint purchasers or employes, to keep secret this process, they cannot now be heard to question the title of the complainant because of a trust relation, either express or constructive, thereby raised, would appeal with great force to a court of equity if in the purchase of the secret process the complainant had acted honestly and was justified in the belief that the vendor's title was without fault. But the mainstay of this proposition is absent in the case at bar. The purchasers knew, or were bound to know, that in treating with Laernoes and his partners they were obtaining for use the property of another, dishonestly procured, and for which they had unsuccessfully negotiated with the true owner. That they afterward disagreed as to which of them should appropriate what they had thus improperly secured does not make it the duty of a court of equity to interfere and by injunction protect some of the wrong-doers against the assaults of their confederates. The want of honor among thieves is not a ground of equitable jurisdiction.

Since the bill of complaint was filed in this cause, the defendants have obtained from the Goldschmidts a license, exe-

cuted in due form, permitting them to use their secret in the United States forever, and in Canada for ten years following the date of such license, which was October 17th, 1904. This assignment conveys to the American Can Company a title to this secret process from its discoverer, and is superior to any rights which the complainant has. The claim made by the complainant that this assignment of, or license to use, the secret process, although made to the American Can Company, must be taken to have been made to that corporation in trust for the complainant, does not, under the facts disclosed in this case, meet my approval, nor has it the sanction of judicial authority. The trust, if any, which existed between these parties was based upon their agreement to keep secret a process purchased in bad faith from Laernoes, and it needs no argument to sustain the proposition that the parties to such a trust have no standing in equity.

After a careful examination of the whole case, I am satisfied that the complainant has failed to present a cause calling for equitable aid, and a decree will be advised dismissing the bill of complaint, with costs.