STATE OF NEW JERSEY, BY JOSEPH E. McLEAN, COMMISSIONER OF CONSERVATION AND ECONOMIC DEVELOPMENT, PLAINTIFF, v. SILVIO A. LANZA, AND MRS. SILVIO A. LANZA, WIFE OF SILVIO A. LANZA, WHO MAY BE KNOWN AS FRANCES P. LANZA OR ALBINA LANZA, SAID NAME "MRS. SILVIO LANZA" BEING FICTITIOUS AND UNKNOWN, DEFENDANTS.

Superior Court of New Jersey
Law Division

Decided November 1, 1957.

364

*Mr. Bernard Hellring* and *Mr. Philip Lindeman, II* (*Mr. Grover C. Richman, Jr.,* Attorney-General of New Jersey, attorney), for the plaintiff.

*Mr. George F. R. Pollard* (*Mr. Charles C. Trelease,* attorney), for the defendants.

HALL, J. S. C. (orally). By this action under *R. R.* 4:85 the State of New Jersey, through the Commissioner of Conservation and Economic Development, seeks to condemn lands of the defendants, described in the complaint, which are located in Round Valley, Hunterdon County. The plaintiff's exercise of eminent domain is based on *L.* 1956,

*c.* 60 (*N. J. S. A.* 58:20–1 *et seq.*), approved June 1, 1956, commonly known as the Round Valley Act.

Defendants by their answer deny the State's right to condemn, principally on the grounds that the cited statute is unconstitutional and the Commissioner's exercise of power granted him thereby has been unlawfully exercised.

*Chapter* 60 of the *Laws of* 1956 begins with the following preamble:

"Whereas, It has long been recognized that additional supplies of water will be needed to meet the future requirements of the people of the State; and

Whereas, To meet this need various proposals have been made for the creation of new water supply systems and, in particular, the projects for the establishment of a water supply system to be known as the Round Valley Water Supply System, for the use of the Delaware river waters; and

Whereas, It is advisable to authorize the acquisition of certain real property which will be needed for additional water supply systems, without awaiting the enactment into law of such statutes as may be necessary to specifically create and establish new and additional water systems; now, therefore * * *."

Then follows these presently pertinent sections:

"[Section] 1. The Commissioner of Conservation and Economic Development is authorized and directed to acquire, in the name of the State, within 2 years from the effective date of this act, such part of the area commonly known as Round Valley, located in Hunterdon county, which in the judgment of the commissioner is appropriate and useful for the future establishment of a water supply system the source of which shall be solely the Delaware River, exclusive of its tributaries.

[Section] 2. Acquisition of said real property authorized and directed by this act may be made by purchase or by the exercise of the power of eminent domain, pursuant to the provisions of chapter 1 of Title 20 of the Revised Statutes.

[Section] 3. In the event of condemnation proceedings pursuant to this act, the Attorney-General shall represent the State and the Commissioner of Conservation and Economic Development.

[Section] 4. Real property acquired pursuant to this act shall be held primarily for use in connection with a water supply system the source of which shall be solely the Delaware River, exclusive of its tributaries, but shall also be made available, as a State reservation, for recreational and other State uses consistent with its primary use, in accordance with rules and regulations to be

promulgated by the Commissioner of Conservation and Economic Development.

\*     \*     \*     \*     \*     \*     \*     \*

[Section] 6. No part of funds appropriated by this act shall be used for any purpose other than for payment of the cost of acquisition of real property by purchase or condemnation award, expenses incurred for the examination of title to the property to be acquired and for expert appraisals and testimony with regard as to the value of property to be acquired.

[Section] 7. There is hereby appropriated to the Department of Conservation and Economic Development for the purposes of this act, $3,000,000, or so much thereof as may be needed, from the Veterans Loan Guaranty and Insurance Fund established pursuant to chapter 126 of the laws of 1944, as heretofore amended, which is in excess of the total amounts of guaranteed or insured loans outstanding now or hereafter as obligation of the Veterans Loan Authority created pursuant to said chapter."

The basic constitutional objection which is raised derives from the particular language of section 1 which directs the Commissioner to acquire "such part of the area commonly known as Round Valley, located in Hunterdon County, which in the judgment of the commissioner is appropriate and useful for the future establishment of a water supply system the source of which shall be solely the Delaware River, exclusive of its tributaries." It is claimed that:

First, basing the appropriateness and usefulness for the precise statutory purpose of the lands decided to be taken on the "judgment of the commissioner," rather than on a determination of these criteria grounded on factual findings, is an improper delegation of legislative power to an administrative official.

Second, there is a complete absence of necessary definitions, designations and standards as to "the area commonly known as Round Valley" (the area being said to be without known geographical limits), as to the part "of the area" to be affected, as to what constitutes "a water supply system," and as to how to determine what is "appropriate and useful for the future establishment" thereof, having in mind the limited source of supply prescribed. Vagueness is alleged to render the grant of authority nugatory. The further point is that the Commissioner cannot properly exercise his judgment as to what lands are appropriate and useful without first know-

ing what kind of a water supply system using only Delaware River water there is to be, and the Legislature has given him no guidance, and so his exercise of judgment cannot have been and was not properly and lawfully grounded or exercised.

Third, affected property owners, including defendants, are deprived of due process of law in that the statute makes no provision for a hearing and opportunity to be heard with respect to the Commissioner's basic determinations or with special regard to the determination as to the taking of a particular owner's lands.

It is to be noted that defendants' attack is very broad. They do not contend that their property is not within Round Valley or that the Commissioner abused his discretion on that score in determining to acquire it. In fact, their lands are clearly in the very center of the valley. The defendants' attack has been answered by plaintiff on the same broad basis and all questions will be so considered by the court.

A further objection is raised on the theory that the appropriation made by section 7 violates *Article* VIII, *Section* II, *paragraph* 2, of the *New Jersey Constitution of* 1947 in that there was no certification by the Governor that the appropriation contained therein, together with all prior appropriations made for the fiscal year, did not exceed the total amount of revenue on hand and anticipated which would be available to meet all appropriations during the fiscal period.

Finally, defendants contend that the action must be dismissed because it is prosecuted by special counsel rather than by the Attorney-General, contrary to section 3 of the act, which as I have said states that the Attorney-General shall represent the State and the Commissioner in condemnation proceedings, and in any event it is said there is no appropriation for such special counsel as required by *N. J. S. A.* 52:17A–13.

Despite the summary nature of the proceeding, the parties were given full opportunity to present all pertinent evidence

at a regularly conducted trial of the issues raised. The plaintiff proved the allegations of the complaint—*i. e.*, that the Commissioner had determined to acquire defendants' lands, which were within the area and in his judgment appropriate and useful for the statutory purpose, and that he had been unable to do so by reason of disagreement as to price. The State also voluntarily produced the Commissioner's staff for the project and his outside consulting engineers as witnesses if defendants desired to call them as such.

Defendants were permitted, by cross-examination of the Commissioner, to develop how he arrived at his determination of the lands to be taken insofar as it was material and relevant under the applicable law. Maps and reports used were produced and later offered in evidence by defendants. In fact, some of the evidence received on behalf of the defendants probably went beyond that which was strictly admissible under the legal principles hereafter referred to. No application was made to turn the action into a more plenary suit than it was, but I conceive that substantially no further admissible evidence would have thereby been discovered, even if defendants had made such an application and it had been granted, since the objections raised principally involve and are limited by legal principles.

In approaching consideration of the questions involved, it must be kept foremost in mind that in an attack upon the constitutionality of a statute, the burden of proof is upon the attacking party. He must leave no reasonable doubt that the act is repugnant. There is a presumption of constitutional sufficiency. *Jamouneau v. Harner,* 16 *N. J.* 500, at 515 (1954), *certiorari* denied 349 *U. S.* 904, 75 *S. Ct.* 580, 99 *L. Ed.* 1241 (1955).

The fundamental concept of the power of eminent domain must also not be overlooked. It "is an inseparable attribute of sovereignty * * * grounded in the primary duty of government to serve the common need and advance the general welfare." *Ryan v. Housing Authority of Newark,* 125 *N. J. L.* 336, 340 (*Sup. Ct.* 1940). It has been allotted

to the legislative branch of government since the Magna Carta. Constitutions do not give but merely place limitations upon the power, which would otherwise be without limitation, as for example, *Article I, paragraph 20 of our Constitution of 1947* providing that private property shall not be taken for public use without just compensation. *Abbott v. Beth Israel Cemetery Association of Woodbridge,* 13 *N. J.* 528, at 543 (1953).

█ In New Jersey the power resides in the State Government. It is elementary that the power may be delegated by the Legislature, as it has been in numerous instances by our Legislature, to state agencies, municipal and other public corporations, and private corporations engaged in a public business, such as public utilities.

This the Legislature does by the passage of legislation. The scope of the power delegated and the manner of its exercise are controlled by such legislation. *Abbott v. Beth Israel Cemetery Association of Woodbridge, supra,* 13 *N. J.,* at *page 545.*

██ Equally fundamental is the principle that the power may only be exercised or its exercise delegated for a use "public" in nature. Whether the use is such is a judicial question. *Ryan v. Housing Authority of Newark, supra.* No question is raised here that the delegated exercise of the power is not for such a public use—*i. e.,* the acquisition of real property for additional water supply systems to meet the future requirements of the people of the State—nor could it be, for it has long been held that the State has an obligation to control and conserve its water resources for the benefit of all inhabitants. *City of Bayonne v. New Jersey District Water Supply Commission,* 30 *N. J. Super.* 409 (*App. Div.* 1954). It was also long ago said that the supplying of water to people is as public an enterprise as can be conceived. *Olmsted v. Proprietors of the Morris Aqueduct,* 47 *N. J. L.* 311, 332 (*E. & A.* 1885).

██ It is also affirmatively established that where the intended use is public the particular taking must be a "necessary" one for the use and the necessity and expediency

of exercise of the power may be determined by such agency and in such mode as the State may designate. Such is a legislative and not a judicial question. The quantity of land to be taken, its location and the time of taking are also legislative questions.

The exercise of all these elements is not subject to judicial interference when such exercise is in good faith and unless there is a plain case of abuse of discretion in excess of the public use on which it is bottomed in the particular instance. *Ryan v. Housing Authority of Newark, supra; Newark v. New Jersey Turnpike Authority,* 7 *N. J.* 377, at 385 (1951); *Burnett v. Abbott,* 14 *N. J.* 291 (1954).

In dealing more specifically with defendants' objections, it must again be recalled that this is a statute where the delegation is for acquisition of land by the State and for a state purpose, and that the attack is not directed to any claim of abuse of discretion or exercise of power with respect to defendants' particular property, but rather to the delegation as a whole as found in the statute.

The first objection goes to the delegation of the "necessity." Here the concept is couched in the language of "appropriateness and usefulness," but in law in these circumstances the meaning is the same, the objection being to the delegation of the necessity being based on the "judgment" of the Commissioner.

The instances of prior statutory delegation of the power to agencies and instrumentalities are innumerable. The pertinent language used is varied in almost every case. But no matter how expressed in a particular statute, it always comes down to resting on the standard of determination, judgment or opinion, as to necessity of the party to whom the power is delegated. As has been indicated, this is primarily a legislative and not a judicial question. The language used in the instant statute I find not to be legally different than that found in the Turnpike Authority Act giving the Authority power to acquire by eminent domain "any land and other property which it may determine is reasonably necessary for any turnpike project * * *."

*N. J. S. A.* 27:23–5(*j*). Such a delegation was held to be unobjectionable in *Newark v. New Jersey Turnpike Authority, supra,* 7 *N. J.,* at *pages* 384 and 385. I therefore conclude that the terms and standards of delegation to the Commissioner in section 1 of the instant statute are valid and constitutional. The situation is not legally comparable or controlled by the precedents relating to requisite statutory standards for administrative action in *quasi*-judicial proceedings under the police power.

I proceed next to defendants' third objection—*i. e.,* that there has been a violation of due process with respect to all affected property owners in that there is no requirement of a hearing, and in fact no hearing in the legal sense was held by the Commissioner, with respect to his basic determination of what properties to acquire. It is well settled that under eminent domain statutes, owners of land to be appropriated are not entitled, as an essential of due process in the sense of the Fourteenth Amendment, to a judicial or *quasi*-judicial hearing on the utility of the proposed improvement, the extent of public necessity for its construction, the expediency of constructing it and the necessity of the particular taking. *Ryan v. Housing Authority of Newark, supra; Burnett v. Abbott, supra.*

Perhaps it might be noted that in one situation our Legislature has provided for a *quasi*-judicial hearing on the question of necessity of the project and propriety of the particular taking before the power may be exercised. I refer to the requirement of such a hearing before the Board of Public Utility Commissioners in the case of electric, light, heat and power companies seeking to condemn any land or interest therein which may be reasonably necessary for the distribution of electricity. *R. S.* 48:7–3 and 4. This the Legislature may require if it believes it wise to do so, but it is not constitutionally required.

However, the affected property owner must be given the opportunity to raise and have determined at an appropriate judicial hearing those questions which are justiciable as previously outlined, as well as, of course, at a later date

the question of the amount of compensation and damages to be paid. This is so whether the particular statute provides for or makes mention of it or not. This opportunity is afforded under our law by the provisions of the Eminent Domain Act, *R. S.* 20:1-2, as amended by *L.* 1953, *c.* 20, and of *R. R.* 4:85. The defendants here have had such a hearing—*i. e.,* that in which we are now engaged. Such satisfies all constitutional requirements. I hold that the defendants' third objection is without merit.

Defendants' second objection is somewhat novel. As I understand it, they contend that the statute is, on the one hand so vague and uncertain with respect to the limits of the area which may be taken and the future general scope and purpose of the proposed use, and on the other hand, so precise and limiting with reference to the source of the water to supply the future system, that the Commissioner is given what amounts to no guidance or standards for the exercise of his judgment, and that consequently any exercise thereof by him must be held in legal effect to amount to an abuse of discretion and an excessive exercise of power.

All delegation statutes in the eminent domain field are necessarily broad and somewhat vague since it is obviously impractical or impossible for the Legislature to prescribe in advance the precise amount or location of property and the like to be taken to carry out the statutory design. *Newark v. New Jersey Turnpike Authority, supra.* I know of no statute that has ever been stricken down in this State on this ground.

Vagueness and indefiniteness in many aspects are unavoidable when dealing with the acquisition of land to make possible some future project not yet definitely outlined and to be undertaken at an undetermined future date, but which the Legislature has determined is necessary now insofar as the acquisition of land is concerned to safeguard the public weal for the future. If present detailed precision was required, before the power could be exercised, the legislative obligation to protect now the public interest in years to come would be completely thwarted.

This is particularly true when we are dealing with provision for an adequate water supply for a people of a growing state already in need of additional sources and systems. Such enterprises by their very nature require large amounts of naturally suitable lands in rural or relatively undeveloped areas for reservoirs and other works which must be at least close enough to possible sources of water to be practically useful. The exact nature of the system and works to be utilized cannot necessarily be determined at the time of the taking. Such depend to a great extent on many factors unknown or uncertain at that time. But again such a situation cannot be permitted to thwart the legislative finding and declaration of a necessary public use and purpose, even if it be *in futuro.*

Our courts have long since recognized this problem in condemnation proceedings to acquire lands for future water supplies and systems and have been outspoken in sustaining as valid exercises of the power of acquisition for such future purposes. *Olmsted v. Proprietors of the Morris Aqueduct, supra; Kountze v. Morris Aqueduct,* 58 *N. J. L.* 303 (*Sup. Ct.* 1895), affirmed 58 *N. J. L.* 695 (*E. & A* 1896), which were condemnation cases involving private water companies.

In the *Olmsted* case the court 47 *N. J. L.* at *page* 329 said:

"It is impossible to estimate with precision the quantity of water that will be needed to supply the wants of a population of about six thousand; nor can it be computed with accuracy what the supply of water will be from the district hitherto relied upon. In a matter of such extreme necessity, all contingencies must be provided for, and the supply should be so ample that a lack of water could not be reasonably apprehended."

So I conclude that it is no objection on any ground that the statute refers to "the future establishment of a water supply system." This expression is sufficiently definite under the circumstances to serve as an adequate guide or criterion for the Commissioner. He does not have to know or be told by the Legislature what kind of a system is ultimately to be established in order for the exercise of his judgment in acquiring lands to be validly based.

The statute says he shall acquire "such part of the area commonly known as Round Valley, located in Hunterdon county," which in his judgment shall be appropriate and useful.

The evidence before me, which constituted, in part at least, the data on which the Commissioner based the exercise of his judgment to acquire the lands which he has determined to take, clearly shows that Round Valley is a well known and recognized area by reason of being quite definitely definable in the physical and geographical sense, and the Legislature must be presumed to have had that knowledge. It is a natural basin, roughly circular in shape, bounded on the north, west and south by the horseshoe shaped Cushetunk Mountain which rises quite sharply to a generally regular elevation of 700 to 800 feet. The irregular and less sharply defined hills on the west end are of lesser height, running four to 500 feet in elevation. Two small streams originating in the valley flow through slight gaps in the north and south walls, running in those respective directions. The oval shape of the valley floor is about 2.6 miles long by 1.5 miles wide. Cushetunk Mountain is composed entirely of trap rock. A better reservoir created by nature could hardly be imagined, made complete by dams erected at the north and south gaps. The source of water would have to be outside the valley.

The precise area had long been recognized as a possible reservoir site. The first reference in the record before me is a topographical study made in 1929 by the State Water Policy Commission, predecessor of the present Division of State Water Policy and Supply in the Commissioner's department, the study apparently having been made pursuant to the statutory obligation to investigate and study the water resources of the State for conservation, development, regulation and use. *R. S.* 58:1–11.

In 1954 the North Jersey District Water Supply Commission published a detailed study called the "Round Valley Project," and in 1955 this Commission sought approval, in a proceeding before the Division, to acquire and develop the

valley for a water supply system for its customer municipalities. It proposed a land taking generally like that now being followed by the Commissioner.

The Legislative Commission on Water Supply, created by *Joint Resolution No.* 3, approved March 18, 1955 (*L.* 1955, at *page* 1009), in a preliminary report to the Legislature made later that year, recommended the passage of a then pending bill to acquire Round Valley as an insurance measure for a reservoir site before increasing settlement of the area made the cost of acquisition much higher.

The Tippetts, Abbett, McCarthy, Stratton Survey of New Jersey Water Resources Development, dated December, 1955, made for the Legislative Commission, thoroughly considered and reported on the use of the valley as an integral part of a new water supply system for the northeastern part of the State under alternative plans using water from the South Branch of the Raritan River, from the Delaware River, or a combination of both, and its projected plans in the survey generally indicated the acquisition of land to the limit the Commissioner is now doing.

The Legislature had this survey before it, as well as its Commissioner's recommendation, when it passed the statute in question. The Commissioner had and utilized all of the above information in determining the exercise of his judgment. All the data clearly shows a sufficiently definite area known as Round Valley which is an adequate guide for the Commissioner and his takings do not go beyond that area. Certainly legislative authority to take "such part" of the area does not preclude taking all or substantially all of it.

On the north, west and south he is taking all land in the basin plus the sides of Cushetunk Mountain to property lines which quite regularly run along the crest. In the west he is taking land which includes sufficient of the lower hills to complete the circular bowl. All this will obviously permit the largest possible reservoir, even though the ultimate use may be decided to be for a less deep or high storage not utilizing the full height of the mountain. I feel he would well be subject to criticism if he did not take all that he

is taking, especially when the outer boundary lines generally run along the crest. I find, as to the area involved, that the legislative standards or criteria are sufficient and that there has been no abuse of discretion in applying them generally.

It is suggested that the limitation in the act to the Delaware River water as to the source of the proposed water supply in some way restricts the acquisition of land to less than that being taken, and makes the Commissioner's takings generally excessive since by presently operative decree of the United States Supreme Court, New Jersey may only take 100 million gallons of Delaware River water per day for out-of-basin uses, and commitments already made out of this quantity reduce the remaining amount available for any system at Round Valley to a figure which would only permit a much smaller reservoir. But again it is a future system which is being provided for, and it seems to me that the Commissioner not only has the power but is duty bound to acquire the maximum amount of land so long as it is in the valley area. The court may at some later date allow New Jersey to take more, or other means may be devised or adopted to acquire the use of more of the water for storage here.

All in all, I see nothing so vague or indefinite, or on the contrary so limiting, in section 1 of the statute as to invalidate it, and nothing in the Commissioner's determination to take which can be said to even approach, as to the whole area of the taking, an excessive use of power or abuse of discretion, assuming the latter concepts to be properly justiciable questions in this action.

Defendants' objection to the constitutionality of the appropriation section, section 7, raises an entirely different question. By that section there was appropriated to the Department for the purposes of the act, a maximum of $3,000,000 from the Veterans Loan Guaranty and Insurance Fund established pursuant to *L.* 1944, *c.* 126.

By this chapter (*N. J. S. A.* 38:23B–1 *et seq.*) the Legislature created in this Department a separate body corporate

and politic called the Veterans Loan Authority, generally to guarantee certain loans to be made by lending institutions to veterans. It provided for an original capitalization of $5,000,000, later increased to $11,000,000, to be subscribed by the State Treasurer, and which was thereby appropriated out of the "Post-War Reserve Account of the General State Fund or the balance held as reserve for post-war needs or to meet expenditures of an emergency nature in the State Highway System Fund."

It is to be noted that this original appropriation to the fund, to the Authority, thus came out of special and not general state funds. This capital and other authority revenues were directed to be held in trust in a veterans loan guaranty and insurance funds to meet the obligations of the Authority. Another special and dedicated fund was thereby created. Section 5 of the Authority Act then provides: "but any amounts in the fund in excess of the total amount of guaranteed or insured loans outstanding at any time shall be subject to such disposition as may be provided by law." This amounts to a reservation in the Legislature to appropriate such excess for other purposes, and this reservation was exercised in part at least by the appropriation section of the Round Valley Act.

This section contains an express legislative finding that the $3,000,000 in question "is in excess of the total amounts of guaranteed or insured loans outstanding now or hereafter as obligations of the Veterans Loan Authority." I believe I am entitled to presume the Legislature knew what it was doing and saying when it made this finding of excess moneys available. That the purpose of the Authority has been largely served and its operations largely concluded is evidenced by *N. J. S. A.* 38:23B–22.2, enacted before the Round Valley Act, transferring all of the Authority's powers, duties, trust funds, property and the like to the Department of Law and Public Safety as of June 30, 1958, with a direction to the Attorney-General to thereupon, as speedily as possible, complete any and all unfinished transactions and wind up its affairs. Moreover there is no evidence before

me that the $3,000,000 is not excess and is not available. Therefore, I feel bound by the legislative declaration and findings.

Defendants urge that the appropriation is violative of *Article* VIII, *Section* II, *Paragraph* 2, 1947 Constitution, reading as follows:

"No money shall be drawn from the State treasury but for appropriations made by law. All moneys for the support of the State government and for all other State purposes as far as can be ascertained or reasonably foreseen, shall be provided for in one general appropriation law covering one and the same fiscal year; except that when a change in the fiscal year is made, necessary provision may be made to effect the transition. No general appropriation law or other law appropriating money for any State purpose shall be enacted if the appropriation contained therein, together with all prior appropriations made for the same fiscal period, shall exceed the total amount of revenue on hand and anticipated which will be available to meet such appropriations during such fiscal period, as certified by the Governor."

It is contended that there has been no certification by the Governor here that this appropriation, together with all prior appropriations for state purposes made for the fiscal year, does not exceed the total amount of revenue on hand and anticipated which will be available to meet such appropriations during the fiscal year. I am assuming that there was no such certification made by the Governor.

But I conceive that none was required, since it seems to me quite obvious that the constitutional provision was not intended to and does not apply to an appropriation for a special purpose lawfully made out of a special dedicated fund subject to no prior appropriations or uses, and not made out of the general state funds which latter are, of course, those available and used for general state appropriations theretofore made.

I can see no purpose to be served in line with the general intention of the constitutional paragraph by requiring the Governor's certificate in such a situation as here. It has no relation to the evils sought to be prevented by the requirements of the paragraph. The situation would, of course, be

different if the Legislature had previously transferred the excess in the Veterans Loan Authority funds to the General State Fund. I hold that the appropriation section is valid.

Defendants' final challenge is to the authority or right of the special counsel for the Commissioner to bring this suit. Section 3 of the act says that the Attorney-General shall represent the State and the Commissioner in the event of condemnation proceedings.

Section 6 provides, to repeat what I have said before, that

"No part of funds appropriated by this act shall be used for any purpose other than for payment of the cost of acquisition of real property by purchase or condemnation award, expenses incurred for the examination of title to the property to be acquired and for expert appraisals and testimony with regard as to the value of property to be acquired."

The complaint here is signed in the name of the Attorney-General, by the special counsel as such. Concededly the latter was designated by the Attorney-General with the approval of the Governor as required by N. J. S. A. 52:17A–13 which provides:

"No special counsel shall be employed for the State or for or by any officer, department, board, body, commission or instrumentality of the State Government except by authority of the Attorney-General, and then only with the approval of the Governor, and provided that appropriations have been made therefor, unless the matter be of such an emergency and shall be so declared by the Governor."

It is contended that section 3 of the Round Valley Act is a legislative declaration that no special counsel may be appointed by the Attorney-General in connection with this statute, but that he must do the condemnation work himself, and in any event any such appointment is invalid for want of required appropriation therefor, since section 6 by implication excludes the use of the funds to pay special counsel.

The argument to the contrary by plaintiff is persuasive under the familiar rules of statutory construction, although

not entirely free from doubt in my mind; but even if defendants' interpretation were sound, which I do not find it necessary to decide, I am of the opinion that they cannot raise the point for the purpose of attempting to secure a dismissal of the action. Clearly, this is not a case where the action was started by special counsel in fact without the authority of the plaintiff. The contrary is clearly true. Defendants are therefore not in any way prejudiced. See *Driscoll v. Burlington-Bristol Bridge Company*, 8 *N. J.* 433 (1952). The court is not here called upon to decide whether special counsel is entitled to be compensated or from what source.

Plaintiff is therefore entitled to a judgment for the appointment of commissioners. Such a judgment will be prepared by plaintiff's attorney, submitted for approval as to form by defendants' attorney, and if it cannot be agreed upon as to form, it can be noticed for settlement before me on any motion day. The judgment may recite the determination of the issues raised by the answer for the reasons and on the findings and conclusions expressed in this oral opinion.

I understand that the Commissioner, as his counsel has advised me in other cases in connection with this Round Valley acquisition, does not desire to suggest to the court the names of any persons for commissioners. If the defendants wish to do so, I shall be glad to receive them. It is, of course, the obligation and responsibility of the court to appoint the commissioners, but I am glad to have any suggestions from either side.