W. L. WEARLY, Ingersoll-Rand Company, The Torrington Company, Plaintiffs,

v.

FEDERAL TRADE COMMISSION, Michael Pertschuk, Chairman, Calvin J. Collier, David A. Clanton, M. Elizabeth Hanford Dole, Paul Rand Dixon, Defendants.

Civ. No. 77–1860.

United States District Court, D. New Jersey.

Oct. 18, 1978.

Christiansen, Jube & Keegan by Sam Radin, Newark, N. J., for plaintiffs Ingersoll-Rand Co. and The Torrington Co.; Burns, Van Kirk, Greene & Kafer, New York City, by Joseph W. Burns, New York City, of counsel.

Carpenter, Bennett & Morrissey, Newark, N. J., for plaintiff W. L. Wearly by David M. McCann, Newark, N. J.; Morgan, Lewis & Bockius, Washington, D. C., by Miles W. Kirkpatrick, Washington, D. C., of counsel.

Robert J. Del Tufo, U. S. Atty. by Donald J. Volkert, Jr., Asst. U. S. Atty., Newark, N. J., for defendants; Mark W. Haase, Sp. Atty., Washington, D. C., Arthur W. Adelberg, Washington, D. C., of counsel.

## OPINION

BIUNNO, District Judge.

This litigation grows out of an administrative subpoena issued to Wearly, who is chairman of Ingersoll-Rand (I–R), which in turn owns all the stock of its subsidiary, Torrington. The subpoena was issued in connection with a non-public investigation designed to look into the question of anti-trust aspects of activities or arrangements conducted through joint ventures, stock acquisitions, and the like. The specific subject matter deals with "needle roller bearings" (NRB) and "loose needle rollers" (LNR).

As everyone knows, there are many kinds of bearings for axles and shafts. The earliest form is the common journal, going back to the wheelbarrow and the wagon. The wheel is of immense value for the physical reason that rolling friction is much lower than sliding friction under most conditions, and since friction causes waste of energy, its reduction increases the efficiency of machines to do useful work.

Even with the development of Babbitt metal for journals, however, sliding friction remained between the shaft and the simple journals. The first important improvement, growing out of technological advances in metallurgy, was the ballbearing. Set between two "races" of hardened steel,

the smooth, round and hard steel balls made it possible to substitute rolling friction between shaft and journal.

It will be recalled that at the start of World War II, the nation's railroads had just begun the process of replacing the simple journal box on freight cars with roller bearings, to eliminate breakdowns from "hot boxes" and sharply reduce maintenance.

After the ball bearing, there came roller bearings, tapered and double tapered roller bearings, thrust bearings, and eventually the needle roller bearing. Each of these forms of bearing are variations of the basic concept of substituting rolling friction for sliding friction. Each form is designed to deal with the wide range of loads and stresses encountered in all kinds of machines that have rotating axles or shafts. The list of applications is no doubt enormous, ranging from the bicycle, through the many devices with shafts in automobiles, refrigerators, washing machines, oil burners, attic fans, and other appliances, through manufacturing equipment such as turret lathes and milling machines, to sophisticated gyroscopes for space craft with rotational speeds of 10,000 r. p. m. or more.[1]

The defendants, who are the Federal Trade Commission and its members, issued the subpoena involved not to I–R or Torrington, but to Mr. Wearly, chairman of I–R. Since the non-public investigation is directed to corporate activity, the reason for addressing Mr. Wearly is obscure. Various responses at the hearings suggest that the reason is "strategic", whatever that may mean, but the only difference the court has been able to discern is that an individual who is subpoenaed and who resists the command after a judicial enforcement order is subject to the peril or jeopardy of imprisonment, which the corporation is not. Thus, the use of an individual subpoena is particularly strange in a case like this, where the subpoena is "duces tecum", and the main object is to obtain specified categories of documents, and where the agency has made clear that it will accept the documents by mail along with a verifying affidavit, as compliance with the subpoena without the personal appearance of the witness being required. This practice for non-public investigations is essentially the same as the Grand Jury subpoena for corporate records. Such subpoenas are routinely satisfied through arrangements with the U.S. Attorney to turn over to him the requested documents without any witness appearing before the Grand Jury.[2]

After the subpoena was issued and served, conferences followed. Such conferences are also commonplace and routine. Their object is to arrive at a clearer and sharper definition of the classes of documents called for. It is fairly usual for the subpoena duces tecum to have attached a list of categories of documents on a "boiler plate" format, that either does not match the particular records of the enterprise, or else calls for types of documents of such massive bulk and number as to be essentially useless to the agency and unreasonably burdensome on the supplier.

For most categories, these matters were resolved by negotiations, and as to those the court understands that the documents have been supplied.

The controversy here involves a number of categories of documents which, for lack

1. This kind of history, background and descriptive information is the subject of judicial notice under F.Ev.Rule 201, by reference to commonly available sources of information whose reliability is not open to question. One reference is the article on BEARINGS, Antifriction, in Vol. 3, Encyclopedia Americana (1957 ed). The volume WHEELS (Life Science Library, 1967) observes at p. 12 that the earliest known record of a vehicular wheel is a sketch made by an accountant (!) in Sumer about 3500 B.C. A sketch on p. 14 details a primitive roller bearing made of an oak hub, wooden rollers and axle, found in Denmark along with other parts of a 1st Century B.C. funeral wagon.

2. A very good narrative account of the common practices followed in gathering documents by subpoena duces tecum for Grand Jury purposes is found in *Hawthorne v. Director of Internal Revenue*, 406 F.Supp. 1098 (D–Pa., 1976). In that report, Judge Edward R. Becker sets out the description (essentially the same as in this District), at pp. 1105–1107.

of a better term, the court has chosen to describe as documents containing "proprietary information". This information includes not only trade secrets, secret processes and secret devices, but also a great mass of management data, evaluations, plans, production and production results of a kind that traditionally and historically is never disclosed outside the company, except on protected and privileged conditions usually established by contract, nor even within the company except to those persons who have a "need to know" the information in order to execute their functions.[3]

In respect to these, an irresolvable impasse was reached. The position of plaintiffs was basically two-fold: one claim was that the request was unreasonable, excessive and beyond authority; the other was that defendants were either unable or unwilling to provide adequate security protection if the data were disclosed, or, if they did, that such arrangements could not be relied on.

The controversy is real, and it is specific. It is plaintiffs' position that this proprietary information is absolutely vital and essential to its ability successfully to compete in the marketplace with all competitors, domestic and foreign, the largest worldwide competitor probably being SKF of Sweden. They assert that this is the kind of information which, in the shrouded world of industrial espionage, is precisely the kind that competitors would give their eye teeth for. If they must give it to FTC for the purposes of the non-public investigation, they will do so with the utmost reluctance and with their "heels dug in". But, even then, they are unwilling to provide it unless effective means are provided to assure that the integrity and safety of the information will be fully protected against disclosure to competitors, either directly or by public dissemination. It is on this aspect that the controversy mainly centers.[4]

Proprietary information, of course, is but one form of intangible personalty, in the same general category as stocks, bonds, mortgages, copyrights, letters patent, and the like. The major characteristic that distinguishes proprietary information from such other forms is that while the disclosure of A's ownership of a particular security in no way affects his ownership thereof or his rights therein, the disclosure of the tenor and content of proprietary information destroys its value as well as the property interest in it. The value resides not in the pieces of paper on which the information is recorded, but in the information itself. Once that information becomes public, the property aspect is gone.

**3.** The property right, of course, is in the information set out by the documents. To retain its quality as property, the information must be kept "secret", as discussed later. Distinguish this characteristic from a copyright or a patent, where the information must be made public in order to obtain the different kind of property interest which resides in them.

For a useful decision distinguishing between pieces of paper and the information written on them, see *Booth v. City of New York*, 268 App.Div. 502, 52 N.Y.S.2d 135 (1944). That case involved the professional services of official court reporters and the typed transcripts of proceedings they prepare, in the context of a sales tax law.

**4.** If the agency were in a position to "use" the information to engage in the manufacture and sale of NRBs or LNRs in competition, as in a governmental manufacturing arsenal for military equipment, it might be argued that the subpoena would amount to a "taking" for public use, for which just compensation would be required. That is not this case.

Rather, as the court understands the issue, the agency wants to examine the information in its non-public investigation in order to consider whether anti-trust laws have been violated. This does not amount to putting the information to "use". For that purpose, a "taking" is avoided by making certain that the information is not disclosed to competitors or to the public, whether under the FOIA or otherwise, since such disclosure would destroy the property interest and would amount to a "taking" for private use.

Plaintiffs' point, then, amounts to saying that just as they would not agree to disclose the information to a licensee without suitable provisions to assure integrity and safety, they are entitled to equivalent protection before turning it over to the agency. The same would be true of confidential disclosures to an investment banker to support a private loan, or to an interested buyer of the Torrington operation, under conditions to protect and return the proprietary information if the transaction is not consummated.

The law in regard to proprietary information, although well known and generally recognized, seems not to have been treated in any comprehensive way, and the decisions reflect indirect aspects depending on the context in which disputes happen to arise. In part, this may be due to the awareness of owners of proprietary information to adopt and follow careful practices to prevent disclosures.

■ Some decisions arise out of the conduct of a former employee who attempts to use the proprietary information for the benefit of himself and a competitor. Others involve conduct by competitors who manage to obtain the information by unequitable, unfair, or improper means. Decisions of these kinds are generally equity cases where, if the showing for relief be made, the traditional remedy is that of injunction. This is for the obvious reason that money damages are usually incapable of ascertainment; and so the damage is "irreparable" in that form.[5]

A few cases deal with the question whether a secret process is "property" within the meaning of corporation laws requiring that capital stock of a corporation must be paid for in money or "property". See, e. g., *Durand v. Brown*, 236 F. 609 (CA–6,

1916). For a comprehensive discussion of the same question involving the issuance of stock in exchange for patents, a closely related question, see *Atlas Trailers, etc. v. McCallum*, 118 Tex. 173, 12 S.W.2d 957 (1929).

In practical experience, the question arises most frequently, and quite frequently, in the context of the law of evidence. The "trade secret" privilege is well-established at common law and is regularly applied in the federal courts. However, the matter arises at the trial level, as an evidence issue collateral to almost any kind of case, and is routinely dealt with at that level with relatively little recording in the reports.

■ There can be no real doubt that the trade secret privilege, as a rule of evidence, is grounded on the property nature of the trade secret and that it recognizes the fact that disclosure of the tenor and content destroys both the value and the property. In balancing the need for evidence against the property right, the well-recognized concept is that the privilege is a qualified one in the sense that disclosure will be required (so that the evidence may be available) but under the control of a protective order (to the end that the property not be "taken").[6]

5. New Jersey has long recognized and given protection to trade secrets, both by way of injunction and damages. *Salomon v. Hertz*, 40 N.J.Eq. 400, 2 A. 379 (Ch.1885); *Stone v. Grasselli Chem. Co.*, 65 N.J.Eq. 756, 55 A. 736 (E & A 1903) (which is evidently the first ruling by the highest court, and which reviews the state of the law throughout the country), *Sun Dial v. Rideout*, 16 N.J. 252, 108 A.2d 442 (1954); *Adolph Gottscho, Inc. v. Amer. Marking*, 35 N.J.Super. 333, 114 A.2d 19 (Ch.1954), aff'd, 18 N.J. 467, 114 A.2d 438 (1955), damage award modified, 26 N.J. 229, 139 A.2d 281 (1958); cover the bulk of the span, with many other cases between.

In general, injunction to restrain employee disclosure is grounded primarily on the property concept; but relief has been given where some trust relation is violated, even though the plaintiff had pirated the trade secret from another, *Vulcan, etc. v. American Can*, 67 N.J.Eq. 243, 58 A. 290 (Ch.1894); 70 N.J. 588, 62 A. 881 (Ch.1905), rev'd, 72 N.J.Eq. 387, 67 A. 339 (E & A 1906).

Sometimes the issue arises in connection with a covenant not to compete, as in *Whit-*

*myer Bros., Inc. v. Doyle*, 58 N.J. 25, 274 A.2d 577 (1971), which recognizes that "the employer has a patently legitimate interest in protecting his trade secrets as well as his confidential business information and he has an equally legitimate interest in protecting his customer relationships."

Another kind of intangible property protected by New Jersey law is categorized as "literary property". A recent example of this protection is found in *Krahmer v. Luing*, 127 N.J. Super. 270, 317 A.2d 96 (Ch.1974), in which a contractor made use of house plans for one house, to build another, and was sued by the architect for pirating his work. Construction of the first house was held not to be such a general publication as would justify copying the plans, since the building was the result of the plans, not a copy of them.

6. Since I–R (the target of the inquiry) is a New Jersey corporation and owns all the stock of Torrington, the situs of this class of intangible personalty is doubtless located here under the usual rule and is governed by New Jersey property law. The only other State whose law

See, for example, F.R.Civ.P. 26(c), for one formulation. The sense of this rule is so well understood, and so regularly applied, that competent counsel have no difficulty, in most cases, in preparing a suitable protective order for entry by consent.

When it adopted the Federal Rules of Evidence, by Pub.L. 93–595, 88 Stat.1926, the Congress was wholly unable to come to agreement on any of the proposed privilege rules. In the rules prescribed by the Supreme Court on November 20, 1972, there were specific privilege rules, among which was Rule 508 dealing with trade secrets. The tenor of that rule follows the recognized characteristics without noticeable change. The key sentence said:

> "When disclosure is directed, the judge shall take such protective measure as the interests of the holder of the privilege and of the parties and the furtherance of justice may require."

The House and Senate and Conference Committee reports disclose that this rule did not give rise to any problem. Rather, sharply differing views in regard to the inclusion of a newsperson's "shield" law, and the scope of the privileges for "Secret of State" and "Official Information" were not capable of resolution, and instead of adopting any specific privilege rules, the Congress enacted a general rule, Fed.Ev. Rule 501, which calls for application of "the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience".

For the purposes of the present controversy, the court is satisfied, and finds, that the formulation of proposed Rule 508 adequately reflects the principles of the common law in the sense required by Fed.Ev. Rule 501.

The enactment of evidence rules by the Congress was the federal culmination of an effort first reflected by the adoption of the Model Code of Evidence by the American Law Institute in 1942. That formulation was the result of a prolonged study, for which Edmund M. Morgan was Reporter, John M. Maguire was Assistant Reporter, and John H. Wigmore was Chief Consultant. In turn, the Model Code was followed by the Uniform Rules of Evidence drafted by a committee of the National Conference of Commissioners on Uniform Laws, approved in 1953 by the Conference and by the House of Delegates of the American Bar Association, as well as by the American Law Institute the following year.

The Uniform Rules draft formed the basis for a report of May 25, 1955 by a committee of the Supreme Court of New Jersey, headed by Mr. Justice Nathan L. Jacobs, and which included other distinguished members such as the late Mr. Chief

---

might apply is Connecticut, where Torrington is based. Connecticut is one of the original states and also a common law state. Its law is usually the same as New Jersey's. Any difference in law has not been briefed or researched. In any event, Mr. Wearly's domicile is irrelevant as he is merely an officer and has no ownership interest in the proprietary information, although he is obliged, as an agent entrusted with it, to see to its protection, and is the witness subpoenaed.

The earliest case discussing the subject in New Jersey appears to be *Salomon v. Hertz,* 40 N.J.Eq. 400, 2 A. 379 (Ch.1885). That case was referred to in *Stone v. Grasselli Chem. Co.,* 65 N.J.Eq. 756, 55 A. 736 (E & A 1903), which was followed in *Taylor, etc. v. Nichols,* 73 N.J.Eq. 684, 69 A. 186 (E & A 1908). *Taylor* is mentioned in *Herold v. Herold China, etc.,* 257 F. 911 (CA–6, 1919) for the proposition that the practice of making disclosures of trade secrets in camera and under seal "is well established."

Of other New Jersey cases, two more worth reading are *Paper, etc. v. Newlin,* 101 N.J.Eq. 115, 137 A. 314 (Ch.1927) and *Sun Dial Corp. v. Rideout,* 17 N.J. 517, 111 A.2d 881 (1955). *Sun Dial* is especially of interest as it recognizes that while an injunction is ordinarily required to specify what is prohibited, this cannot be done when the restraint is against use or disclosure of trade secrets, for such an injunction would be a public record and would itself destroy the property. Instead, the practice is endorsed of recording the details in a transcript made in camera and held under seal, as the ancient practice evidently was.

More recently, and not in a trade secret context, the New Jersey court has approved and encouraged the use of protective orders as a basis for securing testimonial responses. See *Mahne v. Mahne,* 66 N.J. 53, at 62, 328 A.2d 225 (1974); *Gero v. Cutter,* 66 N.J. 443, at 446, 332 A.2d 593 (1975) and *Cashen v. Spann,* 66 N.J. 541, at 545, 334 A.2d 8 (1975).

Justice Joseph Weintraub, former Mr. Justice Frederick W. Hall, former Superior Court Judge Alfred C. Clapp, and Professor Lewis Tyree. With various modifications, that committee proposed adoption of the Uniform Rules for New Jersey.

For reasons arising under the New Jersey Constitution, 1947 which need not be detailed here, the New Jersey Legislature established a Commission on the subject by JR–15, 1955, headed by the late Superior Court Judge John O. Bigelow. The report of that Commission, dated November, 1956, concluded that the rules be adopted by statute, rather than by the court. In 1960, the issue was resolved by enactment of The Evidence Act, 1960, NJPL 1960, ch. 52. That law enacted the rules on definitions (N.J.S. 2A:84A–1 through 15), a section on Scope of the Rules (N.J.S. 2A:84A–16), and the rules on privilege (N.J.S. 2A:84A–17 to 32). For the balance of the rules, a mechanism was established, modelled on 28 U.S.C. § 2072, for promulgation by the Supreme Court of New Jersey and filing with the Legislature and Governor, who could act by joint resolution. The remaining rules took effect September 11, 1967 as promulgated by the Supreme Court and pursuant to JR–5, 1967.[7]

The significance of this brief history in respect to the present controversy is twofold. One, the New Jersey Legislature regarded rules of privilege to be so infused with policy considerations wholly independent of the judicial process of adducing evidence that it undertook to enact the privilege rules itself. Two, in establishing the scope of the rules, it directed that:

"Rule 2(1). The provisions of Article II (Chapter V of the Rules), Privileges, shall apply in all cases and to all proceedings, places and inquiries, whether formal, informal, public or private, as well as to all branches of government and by whomsoever the same may be conducted, and none of said provisions shall be subject to being relaxed." N.J.S. 2A:84A–16.

This scope rule, which derived from the Report of the Bigelow Commission, made the privilege rules applicable everywhere, including any kind of proceeding before administrative agencies. As noted in the Comment to Rule 2 in that Report:

" * * * The Rules governing privileges, however, apply in all cases and all proceedings".

The rationale for this view is obvious: if a communication or other kind of information is to be privileged from disclosure for some policy reason unrelated to the taking of evidence, it should be privileged everywhere, not merely in court proceedings. Long established rules of privilege, such as the attorney-client privilege, the marital privilege, or the trade secret privilege, would be meaningless if protected in a lawsuit before a court, but required to be disclosed in a proceeding before a zoning board of adjustment or any other administrative agency.

While the Congress took the same view as did the New Jersey Legislature in respect to the source of authority to adopt rules of evidence, regarding them as substantive rather than procedural (See H.R. 93–650; S.R. 93–1277), its own scope rule, Fed.Ev. Rule 1101, made the enactment applicable to courts but failed to deal with administrative agencies.

Despite this, it is clear that recognized privileges protecting against disclosure must be applied everywhere if they are to have meaning. When a client communicates with his attorney, he cannot possibly forecast the setting in which he or his attorney may be asked to disclose the communication. The purpose of that privilege is to assure the availability of counsel's advice, the soundness of which depends on full disclosure to counsel. Confidence is essential to the relation. The privilege cannot be made to depend on whether the question is asked in court, or by an administrative agency, or by a Congressional committee.

---

**7.** While Congress undertook to enact all the federal Rules of Evidence, instead of only the definitions, scope and privilege rules (as New Jersey did), it took the same course as New Jersey by enacting a statutory mechanism through which the Supreme Court may initiate changes in the rules. See 28 U.S.C. § 2076 (1975).

■ This is even more emphatically true of the trade secret privilege, grounded as it is on the property interest in the content of the information. Here, constitutional considerations are involved. The sovereign power of eminent domain to take property is inherent in sovereignty. But by Amendment 5 of the Constitution, it may be exercised for public use only upon just compensation. It may not be exercised for private use at all.[8]

■ Thus, it is plain that any failure to recognize and honor the privilege, and to furnish full and adequate protection against the kind of disclosure that would destroy the property interest in applying the balancing test in instances when restricted disclosure is called for in order to conduct a proceeding, would involve constitutional problems of considerable magnitude. This is for the reason that disclosure is required by act of the government, acting through any of its branches. Amendment 5 applies to all the branches, and all agencies and officers of government.

In some cases, no doubt, the need for the information is lacking in sufficient importance to warrant that the trade secret be disclosed at all. In those cases, the matter involved can be resolved fairly and adequately without disclosure. In other cases, whatever is involved cannot reasonably be resolved without disclosure; in those cases, the requirement to disclose is justified by strictly limiting dissemination of the information. This serves the needs of the proceedings and protects the property interest. It amounts to a disclosure under conditions that are themselves privileged.

The concept is well recognized. A good illustration is found in· N.J.Ev.Rule 37 (N.J.S. 2A:84A–29), dealing with waiver of a privilege. The second paragraph reads:

"A disclosure which is itself privileged or otherwise protected by the common law, statutes or rules of court of this State, or by lawful contract, shall not constitute a waiver under this section."[9]

Thus, the owner of a trade secret who discloses it in confidence to his attorney does not waive his trade secret privilege because the disclosure is itself a privileged communication.

So also, the highly confidential data about plant efficiency, production plans, estimates of customer needs, and the like, are commonly disclosed to banks and other financial institutions so that they may pass on loan programs, but only under express or implied obligations not to disclose the information. The owner of a trade secret or secret process may license another to use it, but, if well advised, will require covenants against disclosure.

This characteristic of making disclosure of proprietary information under privileged conditions arising out of contract has been recognized by the Supreme Court. In *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974), the Chief Justice said:

"This necessary element of secrecy is not lost, however, if the holder of the trade secret reveals the trade secret to another 'in confidence, and under an implied obligation not to use or disclose it.' * * * These others may include those of. the holder's 'employees to whom it is necessary to confide it, in order to apply it to the uses for which it is intended.' * * Often the recipient of confidential knowledge of the subject of a trade secret is a licensee of its holder. * * * The protection accorded the trade secret holder is

**8.** Whether the use for which property is taken is a public use is for courts to determine, *Shoemaker v. U. S.*, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170 (1893); *State by McLean v. Lanza*, 48 N.J.Super. 362, 137 A.2d 622 (Law, 1957), aff'd, 27 N.J. 516, 143 A.2d 571 (1958), appeal dismissed, 358 U.S. 333, 79 S.Ct. 351, 3 L.Ed.2d 350, rehearing den. 359 U.S. 932, 79 S.Ct. 606, 3 L.Ed.2d 634; *State v. Totowa, etc. Co.*, 96 N.J. Super. 115, 232 A.2d 655 (App.1967).

**9.** The principle was recognized in the last sentence of Fed.Ev.Rule 511 (not expressly enacted), and the court finds it to be embraced by Fed.Ev.Rule 501. And see, *Gannet v. First Nat'l, etc.*, 410 F.Supp. 585, at 589–590 (D–N.J., 1976); rev'd on another issue, sub nom. *U. S. v. First Nat'l, etc.*, 540 F.2d 619 (CA–3, 1976), aff'd on another issue, 546 F.2d 1072 (CA–3, 1976).

against the disclosure or unauthorized use of the trade secret by those to whom the secret has been confided under the express or implied restriction of nondisclosure or nonuse. The law also protects the holder of a trade secret against disclosure or use where the knowledge is gained, not by the owner's volition, but by some 'improper means', Restatement of Torts, § 757(a), which may include theft, wiretapping, or even aerial reconnaisance. A trade secret law, however, does not offer protection against discovery by fair and honest means, such as by independent invention, accidental disclosure, or by so-called reverse engineering, that is by starting with the known product and working backward to divine the process which aided in its development or manufacture." 416 U.S., at 475–476, 94 S.Ct., at 1883 (citations and footnotes omitted).

The court sees no reason why these fundamental principles, which are hornbook law, should not be applied when the disclosure is not voluntary, but is by compulsion of a subpoena issued by any branch of government, and usually enforced by the judiciary.[10]

█ Failure to provide adequate protection to assure confidentiality, when disclosure is compelled by the government, amounts to an unconstitutional "taking" of property by destroying it, or by exposing it to the risk of destruction by public disclosure or by disclosure to competitors. The constitutional limitation cannot be altered by any branch of government.

The concept of protection for mandatory disclosure of privileged matter finds expression in other laws. Thus, the constitutional right not to be compelled to testify when the testimony may tend to incriminate the witness, has also been made the subject of a balancing test. Under 18 U.S.C. § 6001, et seq., if the government is of the view that it is more important to have the testimony of a witness than it is to prosecute him for what that testimony may reveal, directly or indirectly, it may decide to give up any right to prosecute on the basis of the testimony or information sought from the witness, and obtain a court order directing the witness to testify notwithstanding the right not to self-incriminate.

Similarly, under the Jencks Act, 18 U.S.C. § 3500, if the government elects not to comply with a court order to provide the defense with a "statement", as there defined, for cross-examination, the court may strike the testimony of the government witness or declare a mistrial. In cases where the testimony is essential to make a case, the government's election not to disclose can result in dismissal of the indictment.[11]

---

**10.** The point to be kept in mind here is that the subject of the dispute is *property,* not evidence or subpoenas. The latter merely provide the context in which the dispute arises.

Thus, in bank robbery cases where the culprit is caught with the loot, the stolen money, including "bait bills", is seized by the government as contraband (so far as the robber is concerned) and as evidence. Once the trial is completed, and any appeal of a conviction concluded by affirmance, *the money is returned to the bank.* It is not kept by the government or given away.

In a recent unreported case in this district, a defendant charged with 3 bank robberies pleaded guilty to one charge in exchange for an agreement under Rule 11, F.R.Crim.P. to dismiss the other two charges. After sentence, he sued the United States to recover money taken from him on his arrest. To resist the claim, the United States only needed to show that the money had been stolen from one of the banks even though the charge as to that bank had been dismissed under the Rule 11 agreement. See, also, *Ruth v. First Nat'l Bank etc.,* 410 F.Supp. 1233 (D–N.J.1976) for an even better example of "chutzpa".

**11.** A current example was reported in the Miami Herald of October 25, 1978 (UPI), in connection with the perjury trial in *U. S. v. Berrellez* (D–DC). The six felony counts involve allegations of lying under oath to conceal efforts financed by the CIA and ITT to influence Chile's 1970 elections. The U.S. Attorney had asked that the government not be required, during trial, to disclose otherwise relevant evidence that would involve national security secrets. Judge Aubrey Robinson denied the application, with leave to appeal his ruling within 5 days, and it was indicated that if the information could not be withheld, prosecution of the case would have to be dropped, even though Judge Robinson said that he would allow the testimony to be protected by "sealing the courtroom" while the sensitive data was adduced.

Under the laws governing patents and copyrights, Congress requires disclosure of the invention, or a filing of the copyright material as a consideration for "securing for limited Times to Authors and Inventors the exclusive Right in their respective Writings and Discoveries," U.S.Const., Art. 1, § 8, par. 8.

In all these instances, which are merely illustrations familiar to all, there is a *quid pro quo* of sufficient substance to balance the interests. So, also, compelled disclosures of proprietary information require a balancing *quid pro quo*. Because of the unique nature of the property, which exists only so long as there is only a disclosure that is itself privileged, the only suitable *quid pro quo* is an arrangement, tailored to the particular case, that insures against accidental, or unauthorized, or improper disclosure.

It must be emphasized that, in the context of this case, the issue does not involve the question of deprivation of property "without due process of law", nor the question of taking private property for public use "without just compensation", these being the two explicit provisions of Amendment 5 in respect to property. Rather, the question relates to the "taking" of private property at all, when the taking is not for public use but for private use. This prohibition is implicit rather than express, since it would be an insult to every notion that government may take property for public use only with just compensation, and yet be allowed to take private property for private use without any protection or compensation at all.

Nearly a century ago, it was decided that when private property is taken for public use without compensation, the federal courts may take jurisdiction of an action by the owners in ejectment against the agents of government to establish their rightful title, even though there be no statutory remedy, or an imperfect statutory remedy, for obtaining just compensation. See *U. S. v. Lee,* 106 U.S. 196, 220, 1 S.Ct. 240, 27 L.Ed. 171 (1882), which ruled that the heirs of General Lee were the rightful owners of what is now the Arlington National Cemetery, and (more to the point here) that the provisions of Amendment 5 *were intended to be enforced by the judiciary.*

*U. S. v. Lynah,* 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539 (1903), established the rule that the flooding of lands bordering a system of dams and walls across a river was a "taking" of property for which a judicial action and remedy would be provided even though the Congress did not specifically direct that the property be taken, and even though there had been no formal proceedings to condemn the land.

*Jacobs v. U. S.,* 290 U.S. 13, 54 S.Ct. 26, 78 L.Ed. 142 (1933) ruled that even though condemnation proceedings are not instituted, the owner of lands may assert his claim for compensation in his own action. As Chief Justice Hughes observed there:

"That right was guaranteed by the Constitution. The fact that condemnation proceedings were not instituted and that the right was asserted in suits by the owners did not change the essential nature of the claim. *The form of the remedy did not qualify the right. It rested upon the Fifth Amendment. Statutory recognition was not necessary. Such a promise was implied because of the duty imposed by the amendment. The suits were thus founded upon the Constitution of the United States.*" (290 U.S. at 16, 54 S.Ct. at 27) (Emphasis added).

The *Lee* case is among the precedents relied on to support the action and the claim made in *Bivens v. Six Unknown Agents,* 403 U.S. 388, at 394, 395, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

The present case differs only in the respect that since there cannot be any "taking" for private use, and since the "taking" of the kind of property here involved, without authority in law, is "irreparable" in the sense of money damages, the remedy sought is different. The remedy sought is a declaration that the threatened "taking" is

wrongful, and if that point be established, to prevent the unlawful taking.[12]

It is well known that this kind of question is not dealt with in the precedents, because traditionally the trade secret privilege has been recognized and honored, not only in the courts but also in the other two branches of government. It is only since the enactment of the Freedom of Information Act, 5 U.S.C. § 552, as amended, that the problem has arisen. Through that law, anyone may ask for copies of documents which are among the records of the countless agencies in the Executive Branch, by merely paying the rate for making copies and without any showing of standing, legitimate interest or any other threshold requirement. Documents (that is, the information they contain) furnished under that law are automatically in the public domain, and to the extent that what is furnished amounts to proprietary information, the supplying of it obviously amounts to a "taking" by destruction of the privilege, and the taking is for the use of the private requester, thus making the process one of taking private property for private use. This is the root of the threat and of the risk in this case, for if the proprietary information be turned over to defendants without appropriate protection and assurance of protec-

tion *in advance,* the risk of loss by improper taking is necessarily a considerable risk.[13]

In their note to proposed Fed.Ev.Rule 508, the distinguished Advisory Committee observed:

"While sometimes said not to be a true privilege, a qualified right to protection against disclosure of trade secrets has found ample recognition, and, indeed, a denial of it would be difficult to defend. * * * Congressional policy is reflected in the Securities Exchange Act of 1934 * * * and the Public Utility Holding Company of 1933 * * *, which deny the Security and Exchange Commission authority to require disclosure of trade secrets and processes in applications and reports."

Despite the express provision in the Federal Trade Commission Act, 15 U.S.C. § 46(f), denying the Commission the authority to make public "trade secrets and names of customers", and despite the provision in the Freedom of Information Act, 5 U.S.C. § 552(b)(3) and (b)(4), that

"(b) This section [act] does not apply to matters that are—

. . . . .

"(3) specifically exempted from disclosure by statute;

---

12. Proprietary information, in the trade secret category, is not unlike the status of virginity. Once taken without consent, whether by seduction or rape, it is gone forever.

13. The legislative and public history of the FOIA discloses that the primary consideration for its enactment was to allow public access to internal government workings. The concern was mainly for "Big Brother" risks, as well as for undisclosed, inconsistent treatment of like matters on an *ad hoc* basis rather than by the rule of law. Invasions of privacy, a very broad concept that includes the accumulation in previously inaccessible government files of "raw data", whether reliable or not, was another facet of that concern. In the process, the Act also reached proprietary information possessed by government by compulsion (or voluntarily on recognition of the compulsory power) incidental to the performance of some governmental function. This kind of information was excluded by the black letter of the statutory provisions that the "section" does not apply to specified categories of data, but a surprising number of courts have managed to read this

language as discretionary rather than mandatory.

When the information is in the possession of an agency in the Executive Branch, and is requested on behalf of the Congress from the agency, the risk is considerably increased. Aside from the occasional and well-known instances of improper "leaks", the classic example of the risk involved is that of the late Senator Joseph McCarthy, whose practice it was to make public disclosures under protection of the "speech and debate" clause, *U.S. Const.,* Art. 1, § 6, cl. 1.

While no improper motive is attributed to the Congress as an institutional body, any group that large has a reasonable likelihood of containing one or two members with ulterior motives, and the problem of a Senator McCarthy has not been solved. It takes only one member of Congress, using the speech and debate clause, to destroy proprietary information without known remedy to the victim. The *Tobin* and *A T & T* cases mentioned later, show this to be reality.

"(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;"

there is still a live, active and sharply contested controversy here. One reason, among others, is that 5 U.S.C. § 552(c) says that: "This section is not authority to withhold information from Congress."

At least since *Tobin v. U. S.,* 113 U.S.App. D.C. 110, 306 F.2d 270 (1961), *cert. den.* 371 U.S. 902, 83 S.Ct. 206, 9 L.Ed.2d 165 (1962), and through *U. S. v. Fort,* 143 U.S.App.D.C. 255, at 262–263, 443 F.2d 670, at 677–678 (1970), *cert. den.* 403 U.S. 932, 91 S.Ct. 2255, 29 L.Ed.2d 710 (1971), the courts have been urging the Congress to deal with the problem of claims of privilege, particularly in the extremely delicate setting of a Congressional subpoena. The problem is highlighted by *U. S. v. A.T. & T.,* 179 U.S.App.D.C. 198, 551 F.2d 384 (1976), in which the Department of Justice (in the Executive Branch) sought relief from the courts to prevent disclosure by a witness (A T & T) of information involving national security wiretaps under a subpoena by a subcommittee of the House of Representatives. The opinion is highly educational.[14]

Congress is not unaware of the problem. In Senate Report No. 95–170, to accompany S. 555 (95th Congress, 1st Session) the need for some rational resolution of this aspect of the problem is recognized, especially at pp. 16–21. At this writing, whether any action was taken before the *sine die* adjournment of October 14–15, 1978 is not yet known.

There are other specific statutes involving regulatory agencies, enacted *after* the Freedom of Information Act, in which the Congress has explicitly stated that proprietary information is not to be disclosed, yet these, too, are the subject of litigation in District Courts throughout the country, one of them now pending here, in which the ruling has been delayed so that the court may consider the effect, or the applicability, of amendments enacted within the last month.[15]

14. Earlier this year, the press reported that Secretary Califano of H.E.W. was subpoenaed by a Congressional committee to answer questions which the law forbids him to answer. If he declines to answer, he may be prosecuted under the same law involved in *Tobin.* If he answers, he violates the law which forbids the answer. The authorized penalty under each law is the same. Because the Congress has adjourned *sine die,* the question and his peril may be moot, at least until the next Congress convenes.

15. Under existing New Jersey law, N.J.S. 2A:119–5.1 to 5.5, the theft, embezzlement or copying of "trade secret" information is a criminal offense. These provisions have been embodied in the new Penal Code, N.J.S. 2C:20–1, et seq.

There are other statutory enactments which quite effectively express the balance between the need of an agency to have access to proprietary information, and the need of the owner to have that information protected against destruction by general disclosure.

One statute, N.J.S. 26:2C–9(d), dealing with inspections to locate sources of air pollution, provides that:

"Any information relating to secret processes or methods of manufacture or production obtained in the course of such inspection, investigation or determination, shall be kept confidential and shall not be admissible in evidence in any court *or in any other pro-*

*ceeding* except before the department . ." (Emphasis added).

Another statute, the Mid-Atlantic States Air Pollution Control Compact, N.J.S. 32:29–1, et seq., uses the following language in section 24:

"Any records or other information furnished to or obtained by the commission . . . which records or information, as certified by the owner or operator, relate to production or sales figures, or to secret processes or production, or which if made known to others would tend to affect adversely the competitive position of such owner or operator, shall be retained solely for the use of the commission and its employees, . . . and shall not be published or disclosed for any other purpose by any officer or employee of the commission or any other person without the written consent of such owner or operator."

Still another statute, assigning powers to the Interstate Sanitation Commission in respect to air pollution, provides, in N.J.S. 32:19A–5, that:

"No trade secret or secret process shall be inquired into by the Interstate Sanitation Commission under this act, whether with respect to 1 or more of the substances or 1 or more of the processes, operations, techniques or devices used in connection therewith, and whenever a trade secret or secret process is involved, the activity under this act shall be limited to the identification of the device or facility from which the effluent discharged into the outer air derives, and the nature, rate and period of emission of such effluent.

Although this court does not claim to have searched all the statutes comprehensively, it is informed that there are at least 80 statutory sections, from Title 2 U.S.C. to Title 49 U.S.C., which employ the term "trade secrets". There are said to be more than 20 decisions of the Supreme Court of the United States, alone, in the period from 1944 to 1977 that deal with the term in some fashion. This is a massive literature in primary authority which reflects the wide recognition of the term and the concept it represents.

With the foregoing as an analytical context, it is possible to turn to specific issues in this case. There is no need to repeat here the jurisdictional basis set out at the time the court ruled on the application for preliminary injunction. The determination there made is fortified by the decisions in *Lee, Jacobs* and *Bivens,* mentioned above.

■ That declaratory judgment relief is proper can hardly be disputed. The existence of a genuine controversy between specific parties, over issues that mainly involve questions of law going to their respective rights, duties and legal relations, and depending on the construction of Constitution and statutes, is clear.[16]

It is also clear beyond argument that defendants lack even a rule or regulation governing the subject at the non-public investigation stage, and that the proposed regulation, 43 Fed.Reg. 3571 (January 26, 1978) is woefully inadequate for the protection of private property.

■ It will not do to say that the agency, under ordinary principles, should first have the proprietary information submitted pursuant to its subpoena, and that it will entertain a request for a letter for confidential treatment. This will not do for several reasons. One is that the owner of proprietary information should never make a disclosure of its content, either voluntary or involuntary, without enforceable restrictions against general disclosure, by contract or court order first obtained. Another is

---

"All information obtained from any sampling, tracing or other specific inquiry performed under this act shall be kept and maintained as a confidential disclosure and, except as may be essential for the purpose of referring a complaint to an appropriate enforcement agency and of any enforcement proceeding by or before any such agency, shall not be disclosed or published in any way other than such as will not identify a given substance, process, operation, technique or device with the physical location or identity of the source plant or facility, or with the product made or service performed, or with the person or persons using the same. "A printed copy of the provisions of this section shall be furnished on request to any person furnishing information to the Interstate Sanitation Commission and, in case of an inquiry at a plant or facility, to the person then in charge of the same."

This legislative treatment of the subject reflects an obvious recognition of well established common law and constitutional principles brought into play in circumstances involving proprietary information. Through one formulation or another, they strike a balance between agency needs for access to such information to carry out a regulatory function without invading the property interest. It is of some significance that there is no reported court decision on these statutes. The absence of such litigation speaks well both for the expression of the balance struck and for the honoring of the policies reflected in the statutes without agency attempts to evade or avoid.

16. FTC has argued that there is no "imminent" threat of any disclosure to competitors or to the public, of any of the proprietary information, and thus that the suit is premature. The point is related to whether injunction is warranted, but not to declaratory judgment relief. In *Ortiz v. Engelbrecht,* 474 F.2d 977 (CA–3, 1973), the court reversed dismissal of a suit brought to challenge the "tacking" provision for service of process in dispossess actions. Judge Garth had dismissed because the landlord had decided to abandon the dispossess suit, and thus there was no basis for injunction. As the later proceedings show, 61 F.R.D. 381, at 395 (D–N.J., 1973), jurisdiction existed for processing to declaratory judgment.

Some reported opinions do reflect the view that where injunction is not warranted, then declaratory relief must also be denied. Such expressions may be instances of an exercise of discretion to withhold the relief if it be felt that a declaration would not resolve the controversy. They cannot be taken to hold contrary to what was enacted by the Congress in the Declaratory Judgments Act, 28 U.S.C. §§ 2201, 2202, which authorizes a court to "declare the rights and other legal relations of any interested party seeking such declaration, *whether or not further relief is or could be sought* " (Emphasis added).

that allowing the agency to rule first furnishes an inadequate procedure, because the standards for review are extremely limited, and an owner of proprietary information runs the risk of loss of hi. property on procedural and technical grounds. It is the courts, not the administrative agencies in the Executive branch which are charged with seeing that the Constitution is honored; it is the courts, not the administrative agencies, that decide whether a "taking", even when authorized by statute, is in fact taken for a public use. See, *Shoemaker v. U. S.,* 147 U.S. 298, 13 S.Ct. 361 (1893).

No doubt the courts at one time were reluctant to accept the notion of a declaratory judgment as constituting a judicial act. This reluctance was one of semantics, as Professor Bouchard observed long ago, because courts of law and equity have both engaged in making declarations of rights, duties, status and legal relations for centuries. The action in trespass with a feigned issue is nothing more than a declaratory judgment to try title. Resolutions of conflicting claims between heirs and devisees, long known, are nothing more than declaratory judgments construing wills and statutes. Deliberate violations of municipal ordinances or statutes to invite charges defended by a challenge to the validity of the ordinance or the statute, are inherently proceedings whose object it is to obtain a declaration on the question of validity. A simple scanning of the table of contents in Bouchard's classic text will display countless other examples.[17]

The only difference between those well established actions and the declaratory judgment action lies in the mere form of the action, and in the fact that in most cases a declaration is all the remedy that is needed. Once adjudicated, the dispute is resolved and the parties traditionally honor the adjudication. Further remedies, as by way of execution or enforcement of the adjudication, or by injunction "at the foot of the decree", is rarely needed, but can be provided in the same cause if necessary.

A modern recognition of the declaratory judgment action, perhaps the most civilized form of litigation of disputes yet devised, is found in *Super Tire etc., v. McCorkle,* 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974), from this circuit, in which the Supreme Court sustained jurisdiction even against a claim of mootness, on the ground that the controversy was real, genuine and continuing, and the case was one capable of repetition, yet evading review.

The declaratory judgment is an especially valuable tool in a case like this one. Not only will the determination (whatever it may be) resolve the existing controversy between the parties, but to the extent that its outcome is sound it provides precedent to be considered in the resolution of countless other controversies involving essentially the same underlying question all over the country. Even though this case be massive and difficult, its correct determination promises far more in judicial economy than the many emergency cases that would need to be filed with requests for temporary restraining orders after receiving a 10-day notice of intent to disclose proprietary information, which defendants propose.

The controversy is real and genuine. It involves a peculiar form of property that can vanish by evanescence, sublimation or osmosis. It is in that class of personalty, like the heirloom, the original manuscript of "Look Homeward, Angel", the Mona Lisa, the Venus de Milo, and other like items for which equity historically has provided the suitable remedy of specific reparation. By resolving the controversy now, through the declaratory judgment, the need for the extraordinary remedy of specific reparation can be avoided, as can the incalculable risk that even that remedy would be hollow if the *res* had meanwhile "gone public".

The court does not see this case as one of "judicial review" of some administrative action. Nor is this a case of conducting a hearing "de novo" after some administra-

---

**17.** Particularly applicable is the discussion in *Bouchard,* "Declaratory Judgments" (2nd Ed) under the leads "Titles to Personal Property"

(pp. 753–758); "Administrative Powers and Disabilities" (pp. 875–900); and "Relief for Peril and Insecurity" (pp. 927–1019).

tive hearing and determination. Rather, this is a case invoking the original jurisdiction of the court, as a court of first impression. It is a plenary action to resolve a clear-cut controversy. Plaintiffs assert their claims of rights, duties and legal relations, and defendants contest them. There is nothing in the law to suggest that a governmental official, or a government agency, cannot be a party to a controversy within the scope of a declaratory judgment action. The books in jurisdictions throughout the nation, state and federal, have many precedents of this nature in which the controversy is between private parties on the one hand and government on the other.

█ On the record before this court, it has been clearly established that the disputed documents contain proprietary information, that defendants have no right to make any of it public or to provide it to a requester under the Freedom of Information Act or any other act, and that plaintiffs are entitled to a declaratory judgment to resolve the controversy. The court so finds on both the facts and the law.

Ordinarily, this is as far as a court would need to go. Ordinarily, a court would refrain from granting other or further relief beyond the declaratory judgment. This is especially so in a case involving officials and agencies of government because the court expects that the declaration will be honored and adhered to so long as it remains in force.

With due regard for recognition of the principles of comity between the several branches, and with considerable reluctance, the court concludes and finds that its judgment in this case must provide a suitable remedy beyond the declaration itself.

The reason for this conclusion and finding is that in the course of the case, the defendants chose with awareness and deliberation to decline to submit some 152 documents sought for discovery, for in camera inspection so that the court could rule on various claims of privilege raised by them. The court's orders in this regard were drafted with great care, to assure defendants the same protection as is claimed by plaintiffs for their privileged information.

The mechanism chosen called for delivery of all the documents to the U.S. Attorney, who is the attorney of record for defendants under the General Rules of this District. A list of the documents was to be furnished to the court under seal, along with a designation of a few items in each claim of privilege to be inspected in camera under seal. Defendants were assured that no ruling adverse to any claim of privilege on any document would be made without first conducting an evidentiary hearing from which plaintiffs and their counsel would be excluded.

To the extent that defendants asserted that some documents contained proprietary information owned by persons not party to the action, the order directed that those persons be given notice so that they might appear and be heard on the question.

The court's orders in this regard were not honored. It is satisfied that this disregard of orders was not out of disrespect for the court, but rather to preserve some unknown and unidentified legal issue never presented. The cases are essentially uniform and clear that all the privileges claimed by defendants, like the privilege claimed by plaintiffs, are qualified privileges for which in camera inspection, hearings under seal, necessary deletions of sensitive matter, and the like, are part of the regular business of the trial courts.

The posture taken on these orders is both distressing and dismaying, because the clear inference is that a declaratory judgment, without more, will similarly be disregarded.

The process of balancing interests when dealing with privileged information subject to qualifications is quite simple. Given a colorable showing that the information is proprietary, recognition of the property right takes the form of ready (and not stingy) award of suitable protection against improper disclosure. The greater the degree of protection, the more generous a court can be in ordering disclosure. But when the indications are as strong as they are here that orders of the court will not be

honored, there can be no confidence that its declaratory judgment, by itself, will be honored.

What form that kind of additional relief ought to take is reserved until such time as the court has heard both sides on the issue. In the meantime, the protective order originally entered herein and as later particularized and refined, will remain in full force and effect. This will assure that the subject of the controversy will remain in the jurisdiction of this court pending resolution of the question now posed. This is seen as unavoidably necessary, for the time being, even though under other circumstances the court's inclination would be to supplement the declaratory judgment with a protective order to preserve the subject matter, and otherwise allowing delivery of the documents to defendants in Washington on suitable terms. The recalcitrance of defendants precludes that usual approach in this case and at this time.

The heart of the controversy having been disposed of above, it remains to treat a number of collateral issues.

■ The source of the claim is said to arise under Amendments 4 and 5 of the U.S. Constitution, under the FTCA, 15 U.S.C. § 41 et seq., under the Administrative Procedure Act, 5 U.S.C. § 551, et seq., 18 U.S.C. § 1905, The Declaratory Judgments Act, 28 U.S.C. §§ 2201, 2202; the Census Act, 13 U.S.C. § 9, and the Federal Reports Act, 44 U.S.C. § 3501, et seq.

In view of the analysis of the controversy, it is clear that the claim arises under federal law, the primary sources being Amendment 5 of the U.S. Constitution, the FTCA, and the Declaratory Judgment Act. The other references, to the extent pertinent, are corroborative of these major sources whether they provide independent grounds or not.

Jurisdiction is claimed under 28 U.S.C. §§ 1331, 1337, 1361, and 2201 and 2202. The last two sections authorize the declaratory judgment remedy but are not jurisdictional grants in themselves. Jurisdiction is also claimed under 5 U.S.C. §§ 701–706, but

in view of the footing based on the Constitution, in the light of the *Lee, Lynah, Jacobs* and *Bivens* cases, and because of the restricted nature of the Administrative Procedure Act in comparison with the full, plenary nature of the action on constitutional aspects, these sources add nothing to the jurisdictional question.

■ Venue was also challenged. The court sees no arguable issue in this regard. The non-public investigation was aimed at I–R which is here in New Jersey. As the parent company owning all the stock of its wholly owned subsidiary, Torrington, I–R is the "real party in interest." Since venue is clearly proper as to I–R, there is no reason why proper parties like Mr. Wearly (to whom the subpoena was addressed) and Torrington (which manufactures the NRB's and LNR's) cannot join as plaintiffs in the same action. Had I–R brought suit alone, both could have applied to intervene because of their related interests, which are inextricably intertwined.

While this is probably not a "local" rather than "transitory" action, the fact is that property rights and property interests, in the context of a "taking" by government, are traditionally defined by state law rather than federal law. See, for example, the Annotation at 1 ALR Fed. 479. Local law in the District of Columbia could not possibly have any application.

■ Next is the question whether FTC's summary proceeding for a court order to enforce the subpoena was a "mandatory counterclaim" under F.R.Civ.P. 13(a). The court is satisfied that it was. The language and the sense of the rule are clear: it requires, in mandatory form, that a pleading "*shall* state as a counterclaim *any claim which at the time of serving the pleading* the pleader has * * *" (Emphasis added). The term "claim" is extremely broad and more than adequate to embrace FTC's claim for a subpoena enforcement order.

FTC protests, however, that under section 9 of the FTCA, such proceedings can only be brought in the district where the agency inquiry is being carried on, namely

in Washington, D. C., and it so persuaded the learned District Judge there on the application of Mr. Wearly and I–R to transfer venue of the subpoena enforcement proceeding to this district (see Transcript of Hearing, Exh. D–1–C, vol. III, pp. 820–821). With due regard to the view of that trial court, the question there presented was different. The question there was one involving a transfer of venue. The question here, where the plenary action was already pending, involves the applicability of the mandatory counterclaim rule. Only this court could effectively rule on the point, since a mandatory counterclaim could only have been filed here, not in the District of Columbia. The court is satisfied, and finds, that the summary enforcement claim is a claim coming within F.R.Civ.P. 13(a), and that it should have been stated as a counterclaim along with the answer in this case.

The mandatory counterclaim requirement is the closest that federal courts have come to the achievement of the laudable "single controversy" doctrine, under which all parties to a pending action in one court must assert in the same proceeding any and all related and connected claims.

Nor is the "venue" argument persuasive, in terms of where the "inquiry" was being conducted. The principle is well-established that when the mandatory counterclaim rule applies, venue requirements that would otherwise control have no application. No other treatment could possibly achieve the worthy purposes of the mandatory counterclaim requirement.[18]

There is neither time nor space here to detail the independent steps taken by FTC, well after this action was underway, to initiate summary subpoena enforcement proceedings in the District of Columbia, although the full record there has been carefully reviewed. Suffice it to say that their culmination in an enforcement order is not res judicata of the issues here. In such proceedings, the party haled into court cannot assert, as a matter of right, claims and issues like those asserted here, and insist on having a decision on the merits. Nothing decided in the District of Columbia reached or decided the issues involved here. At best, they were regarded as premature, presumably to be considered after the claim of privilege had been asserted before FTC, in connection with a proceeding for contempt or a criminal prosecution. For the reasons discussed above, the questions cannot be premature because proprietary information should never be disclosed unless the privileged conditions or protective order are first established.

 If anything is clear about the law of res judicata, it is that the court in which that claim is advanced is the only court authorized to decide the issue. That court is this court. The record is clear that the summary proceedings in the District of Columbia, although culminating in an enforcement order earlier in time than this ruling, neither took up nor decided the issues decided here. Absent an earlier *decision,* the defense of res judicata has no application.

Finally, there is the matter of sanctions sought by plaintiffs against defendants for their outright refusal, although respectful, to comply with the discovery orders here. The court believes that this point should be reserved for further deliberation and further hearing after the parties have recovered from the "heat of battle". Without sanctions, the evidential record is extremely strong. The testimony of plaintiffs' witnesses fully supported their claims, and were in no way depreciated by cross-examination. The samples of the disputed documents which the court inspected *in camera*

---

18. Venue is controlled by where the case is "brought"; since a suit was brought here by plaintiffs, the venue requirements do not apply to the compulsory counterclaim. See *Lesnik v. Public etc.,* 144 F.2d 968 (CA–2, 1944); *G & M Tire v. Dunlop, etc.,* 36 F.R.D. 440 (Miss., 1964).

Nor is any independent jurisdictional ground needed for a compulsory counterclaim, *Moore v. N.Y. Cotton Exchange,* 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926); *Scott v. Fancher,* 369 F.2d 842 (CA–5, 1966).

For an excellent discussion of the "single controversy" doctrine as such, see *Bennun v. Board of Governors, etc.,* 413 F.Supp. 1274 (D–N.J., 1976).

fully corroborated that testimony. Under this court's discovery order, granted at defendants' request, all of the documents were gathered in New Jersey, put under strict controls to assure integrity and reliability, and made available to defendants not only for the purposes of this case, but also so that they could proceed with the nonpublic investigation at the same time. Defendants chose deliberately not to inspect the mass of documents so made available. The court can only infer and conclude that they are well aware that even with such inspection and further testimony, they could not successfully controvert the showing made that these sensitive documents contain proprietary information entitled to an effective protective order.

The record also contains examples of a number of instances where informal arrangements for confidential treatment of proprietary information were not strictly honored. One in particular, where proprietary information was made public without notice to the provider, and despite a supposed protective order by an administrative judge, is enough proof of the reality of the threat and risk in and of itself. Defendants argued that the disclosure did not violate the literal terms of the order, but it strains credulity to argue that this position is other than hypertechnical and that both the FTC staff and the administrative judge must have been fully aware that the disclosure was an evasion, and a violation of the spirit of the order. This kind of behavior by government simply cannot be countenanced.

So far as the 152 documents are concerned, the fact that claims of privilege were raised allows no adverse inferences to be drawn. However, the unexplained refusal of defendants to submit these documents for *in camera* inspection and for hearings under seal without the presence of any representative of plaintiffs does warrant the inference that, if the privilege claims were found to be unwarranted or subject to a balancing test, the facts disclosed thereby would have been adverse to defendants.

As noted above, the decision here is reached without the benefit of these inferences. The utter inadequacy of a suitable system of full protection against disclosure, established *before* any proprietary information is turned over, is sufficient to support the judgment.

Also, although some courts have regarded criminal statutes such as 18 U.S.C. § 1905 as providing adequate protection, this court cannot agree. This kind of statute is at best precatory and unenforceable as of right by the aggrieved person. The most the owner of proprietary information can do, if his property is destroyed by improper disclosure by a government employee, is to file a complaint charging violation of the criminal statute. Given the vast number of government employees, and the plethora of copy machines, the complaint would doubtless have to be against "John Doe". From that point on the vindication of his claim through the criminal justice system would be dependent entirely on the efficacy of the investigative process and prosecutorial discretion whether or not to press the charge. And a "reasonable doubt," by itself, would be enough to bar conviction. Even if the culprit were found, charged, tried, convicted and sentenced, this would be no remedy at all for the loss of property through improper disclosure. The damage would have been done, and would be irreparable. Nothing short of enforceable means established in advance of compulsory disclosure will serve.

After review of this ruling, the parties are directed to appear before the court on November 3, 1978, at 10 AM, so that they may present their views in regard to the tenor and phrasing of a final judgment in accordance herewith.